[Cite as *In re E.H.*, 2022-Ohio-1682.]

COURT OF APPEALS
STARK COUNTY, OHIO
FIFTH APPELLATE DISTRICT

| | | |
|---|---|---|
| IN RE: E.H. | : | JUDGES: |
| | : | |
| | : | Hon. Earle E. Wise, Jr., P.J. |
| | : | Hon. Patricia A. Delaney, J. |
| | : | Hon. Craig R. Baldwin, J. |
| | : | |
| | : | Case No. 2022CA00007 |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | O P I N I O N |

CHARACTER OF PROCEEDING: Appeal from the Stark County Court of Common Pleas, Family Court Division, case no. 2020JCV00898

JUDGMENT: AFFIRMED

DATE OF JUDGMENT ENTRY: May 18, 2022

APPEARANCES:

For Plaintiff-Appellee:

BRANDON WALTENBAUGH
STARK CO. DJFS
402-2nd St. SE
Canton, OH 44702

For Defendant-Appellant:

DEAN L. GRASE
700 Courtyard Centre
116 Cleveland Ave. NW
Canton, OH 44702

*Delaney, J.*

{¶1} Appellant Father appeals from the December 21, 2021 Judgment Entry of the Stark County Court of Common Pleas, Family Court Division, overruling his motion to extend temporary custody of the minor child, E.H., and granting permanent custody of E.H. to appellee Stark County Department of Job and Family Services ("Agency").

## FACTS AND PROCEDURAL HISTORY

{¶2} E.H. was born on August 28, 2020, to Mother, who is not a party to this case. The Agency became involved with E.H. upon his birth when the child and Mother both tested positive for cocaine. Mother lost permanent custody of one child and has lost legal custody of other children. Additional concerns for Mother include untreated mental health problems, substance abuse, and homelessness. Mother has been diagnosed with bipolar disorder and unspecified schizophrenia.

{¶3} Mother did not initially provide the name of the child's biological father.

### *Procedural history*

{¶4} The Agency assigned a Caseworker to the matter at the intake level on August 29, 2020; E.H. was removed from Mother on August 31, 2020, and has remained in the temporary custody of the Agency throughout the duration of this case.[1] That day, the Agency filed a complaint alleging the dependency and/or neglect of E.H. On September 3, 2020, an emergency shelter care hearing was held and E.H. was placed in the emergency temporary custody of the Agency.

---

[1] Mother was provided with case plan services, mostly related to her mental health, which she did not complete. Mother has not engaged in any case plan services and is difficult to track due to her unhoused status. Mother has been arrested multiple times since the initiation of the instant case and did not participate in the case at the trial level.

{¶5} Mother eventually revealed Father's name to her attorney and Caseworker located him. Father was established as the father of E.H. following DNA testing and the case plan was amended to include services for him.

{¶6} At an adjudication hearing on November 30, 2020, Father stipulated to a finding that E.H. was a dependent child. Temporary custody of E.H. was granted to the Agency.

{¶7} On December 23, 2020, Father filed a motion for custody of E.H. A review hearing was held on February 26, 2021; Father withdrew his motion and status quo was continued.

{¶8} On July 19, 2021, Father filed a second motion for change of legal custody.

{¶9} On July 29, 2021, the Agency filed a motion for permanent custody of E.H. A review hearing was held on July 30, 2021, and the trial court concluded there were no compelling reasons to preclude the request for permanent custody.

{¶10} A hearing on the motion for permanent custody was scheduled for September 28, 2021, and then continued to November 4, 2021.

{¶11} On November 3, 2021, Father filed a motion to extend temporary custody.

{¶12} The trial court rescheduled the permanent custody hearing for December 14, 2021.

{¶13} On that date, the trial court heard evidence on Father's motions for legal custody and extension of temporary custody, and on the Agency's motion for permanent custody.

*Evidence adduced from the permanent custody hearing*

{¶14} Father was established as the father of E.H. following DNA testing and the case plan was amended to include services for him.

{¶15} Father was to complete a parenting evaluation at Lighthouse with Dr. Thomas. Father did complete the evaluation. Dr. Thomas' further recommendations were conveyed to Father by Caseworker and included the following: see a neurologist and obtain medication for his seizure disorder; complete Goodwill Parenting; and go to Melymbrosia.

{¶16} Caseworker testified that Father was not receptive to Dr. Thomas' recommendations when she discussed them with him several times; Father "voiced * * * resistance" to engaging in services and told Caseworker she "was making this up." T. 17-18. Father also did not sign releases of information.

{¶17} Caseworker described difficulties in implementing the case plan with Father. Father did not engage in services at Melymbrosia (anger management) until the Agency filed a motion for permanent custody of E.H. Father told Caseworker he was under the care of a neurologist, but she later learned he has not been seen by a neurologist since 2011 or 2012. Father said he went to Coleman for services, but in reality, he attended Coleman over 10 years ago and records were no longer accessible. He also said he went to Melymbrosia when in fact he did not. T. 18. Father frequently gave conflicting information within the space of a single visit.

{¶18} Caseworker's concern was that these issues with Father originated with neurological issues, not a general lack of truthfulness. On a visit, Father did not recognize the longtime caseworker. Father repeated the same phrases throughout visits. Father

did not remember the child's diaper size from week to week. Caseworker noted that at times, Father attended visitations smelling strongly of marijuana and admitted he smoked marijuana; he said he had a medical card. He never provided any documentation that he is prescribed medical marijuana. Caseworker asked Father to complete a Commquest assessment due to the marijuana use, and Father complied; Father was also subjected to random drug screens and tested positive for marijuana use. Father readily admits to continued marijuana use and continues to claim it is prescribed without showing documented proof of any such prescription.

{¶19} Caseworker's concern with Father's short-term memory, "as an assessor of risk," is whether he is impaired by chronic marijuana use or by a seizure disorder. Evaluation by a neurologist would help determine the answer to this question.

{¶20} In terms of Father's seizure disorder, Caseworker has been given conflicting information. Father does receive social security and told Caseworker he had a traumatic brain injury. At other times, Father denied the traumatic brain injury and seizure disorder. Father did sign a release permitting Caseworker to view a neurological evaluation, but she did not recall the diagnosis. T. 28.

{¶21} Father does have adequate housing, although Caseworker indicated she has problems with people coming in and out of the home, including Mother. Caseworker testified Father has provided inconsistent information about his continued contact with Mother and does not recognize the severity of Mother's mental health concerns. At one point, Father told Caseworker, "You know I will have [E.H.] until Mother gets better, right?" T. 49.

{¶22} Caseworker has concerns with Father's overall behavior; when he is confronted with information he disagrees with, Father is resistant, sometimes to the point of becoming combative. Father has hung up on Caseworker when she has attempted to discuss case plan services on the telephone, and has "yell[ed] and scream[ed]" at Caseworker and her supervisor that he doesn't need to do services.

{¶23} Caseworker testified that Melymbrosia treatment for anger management is absolutely vital in this case. The permanent custody motion was filed in July, and Father began Melymbrosia in August. As of the permanent custody hearing, Melymbrosia was still an active case plan objective; the doctor leading the program told Caseworker he has met with resistance from Father, who was kicked out of the group at one point. Father had minor attendance issues and has been "fairly resistant" to treatment services, course correction and feedback. T. 24.

{¶24} Caseworker testified that completion of Goodwill Parenting is a requirement of Father's case plan, but she is unable to refer him to Goodwill Parenting until he completes Melymbrosia.

{¶25} Father completed a parenting program at Pregnancy Choices on his own initiative. Caseworker testified this is a program typically for pregnant mothers and that she told Father it is not equivalent to Goodwill Parenting.

{¶26} Caseworker testified that she is concerned about Father's criminal history and familiarity with Belmont, a correctional facility.[2]

---

[2] Caseworker was asked to relate Father's criminal history and Father objected, arguing the information was hearsay. The trial court sustained the objection because Caseworker did not have a certified copy of Father's criminal history. Instead, she testified Father told her he is "very well-known at Belmont," a correctional facility. T. 26-27. Father's criminal history is discussed in more detail infra regarding the GAL report.

{¶27} Father does have supervised weekly one-hour visits with E.H. at the Agency which were initiated after paternity was established. Caseworker testified Father brings items to visits for E.H. and engages with the child, getting him to smile and laugh; E.H. appears very happy with Father and "is thrilled to interact with people in general." T. 29. Caseworker testified Father comes to visitation smelling very strongly of marijuana, which is a concern, and sometimes has to be redirected; Father is not receptive to redirection.

{¶28} Upon cross-examination, Caseworker acknowledged she received Dr. Thomas' report and recommendations on June 28th and the Agency filed the motion for permanent custody on July 29, 2021. Caseworker noted she did discuss elements of the recommendations with Father on May 5, but under the broadest interpretation of the timeline, Father had two months to attempt to complete case plan services before the permanent custody motion was filed. Goodwill Parenting alone is ten to twelve weeks to complete, but Caseworker pointed out that Father didn't make enough progress for her to make a referral to Goodwill Parenting.

{¶29} Upon redirect, Caseworker testified Father hung up on her during the May 5 call when she initially told him what services were recommended; she talked to him again in June, and sent the amended case plan to him, but Father did not engage in services at that time, nor would he sign releases of information, so she had no reason to believe he would attempt the case plan. Caseworker was willing to seek an extension of the case plan, but Father has not complied to the extent that he could complete the case plan even if he were given a 6-month extension.

{¶30} Caseworker further acknowledged Father was referred to Commquest due to her concerns with substance abuse, but he had no further recommendations. Father

does have income and housing, but he has not yet completed Melymbrosia, although he has started it. Father did obtain items for E.H. from the parenting classes he voluntarily attended at Pregnancy Choices, including a car seat and pack-n-play.

{¶31} Caseworker acknowledged Father signed a release for her to review a neurological assessment dated July 25, 2012. The form stated Father was diagnosed with alcohol withdrawal seizures and a "complex partial seizure with secondary generalized seizure which may be alcohol related," but she did not have concerns for Father's current alcohol use.

{¶32} Father also provided Caseworker with names of several relatives for placement, but she testified that the paternal relatives were not considered for placement because E.H. is presently in a kinship placement with ties to his maternal family. Paternal Grandmother participated in video visitation and indicated she would be willing to have placement of E.H.

{¶33} Upon further inquiry, Caseworker testified E.H. is in a placement with his maternal half-sibling and has visitation regularly with other maternal half-siblings.

{¶34} Dr. Aimee Thomas of Lighthouse Family Center, a psychologist, testified about her parenting evaluation of Father at the permanent custody hearing. She described Father as defense in his approach to the structured clinical interview; he denied problems with anger management "despite a criminal history that suggested otherwise." T. 63. Thomas was concerned about a reported seizure disorder combined with marijuana usage, on top of meeting the needs of an infant child who would need proactive supervision. Father has six biological children and was incarcerated while most of them were young so he did not have experience as a primary caretaker for young child.

{¶35} Father's responses to Thomas' questions were inconsistent regarding his substance abuse and its role in his criminal history. Overall Thomas opined Father needed to consult a neurologist about his apparent memory issues and whether they arose from substance abuse (marijuana) or an alleged seizure disorder for which he was not presently being treated. He would also have to stop using marijuana if he did have a seizure disorder. Father also reported problematic use of alcohol in the past and was inconsistent in his responses about his current use of alcohol.

{¶36} Father had a significant history of criminal offenses including aggravated robbery and domestic violence; he also had repeated incarcerations.

{¶37} Thomas' ultimate diagnoses of Father were cannabis use disorder; other specified personality disorder with anti-social traits; seizure disorder; and an identified memory impairment. She recommended that Father participate in Goodwill Parenting and Melymbrosia; obtain a neurological evaluation to address the seizure disorder with appropriate medication; monitor the memory impairment; and abstain from marijuana unless it is prescribed and not affecting his memory.

{¶38} Upon cross-examination, Thomas acknowledged Father's criminal history was from 1998 to 2003, and she didn't personally observe significant memory issues. However, Thomas noted that a neurological evaluation from 2012 would not have alleviated her concerns, although the evaluation was not provided to her.

{¶39} Dr. Steve Dean, the clinical director of Melymbrosia, testified about Father's participation in his agency's domestic violence treatment group. The goal of the program is to instill members with strategies for dealing with conflict more effectively and to develop self-awareness in terms of risk factors for violent behavior. The ultimate goal is to turn

members away from impulsive reactions that are physically and verbally aggressive. Father's attendance rate is around 75 percent and he has completed 7 or 8 sessions out of 18 total. Dean was concerned about Father's participation in the group, however; Father was insistent that he has never been physically aggressive with a woman, but when Dean sought to validate that statement with voice stress analysis, Father made excuses not to participate. Father also has more than one domestic violence conviction so Dean doubts his story that none of those incidents are with a partner. He described Father as argumentative and difficult to redirect; at one point, Father was asked to leave the group. Father is compliant but does not have insight into why he needs group therapy; he is quick to become defensive and has not made significant progress.

{¶40} Father testified on his own behalf. He stated he was "shocked" when he was notified that he might be E.H.'s father and was required to take a DNA test. He is a 50 year-old single male. Father acknowledged he has six biological children and was in prison for a total of five years; he was released from prison in 2003. He has not been the primary caretaker of any of his children, although he has provided for them; he believes strongly that children should be raised by their family members. He admits he was defensive with caseworkers and the Agency but he has trust issues with the system; he realizes, overall, that the Agency is working to ensure his child is raised in a safe environment and he supports that goal. He wants to see E.H. more often. He denied that he has ever used corporal punishment with any of his children. His prior domestic violence conviction involved his brother.

{¶41} Father acknowledged arguing with the caseworker about his child's foster parent; he asked whether the foster parent is vaccinated and testified he has heightened

anxiety because of the pandemic. He wants to be able to see his child, and thus has tried to isolate himself to stay healthy to do so. He described the Melymbrosia session he was asked to leave; he became highly anxious after another group participant described Covid symptoms and Father was the only person in the room wearing a mask.

{¶42} Father admitted use of marijuana.

{¶43} Father testified that he contacted Goodwill Parenting and learned he needed a referral, which he couldn't obtain because the caseworker would not provide one. He thought Parenting Choices might serve as an alternative and he completed their program.[3]

{¶44} Upon cross-examination, Father was asked to explain his delay in starting services, and he responded that he didn't trust the caseworker and wanted to wait to see what the Court would say.

{¶45} Father was questioned about his criminal history. A domestic violence conviction from 1998 was against his brother, but from 2014 was against a woman; a 1992 felonious assault charge was no-billed but was against his romantic partner at the time; and 2008 charges of aggravated menacing and telecommunications harassment was against his "baby's mom."

{¶46} Caseworker testified about her knowledge of E.H., an African-American child who was less than two years old at the time of the hearing. E.H. is developmentally on target and will be walking soon. He does not have special needs and presently resides in an Agency-licensed foster home with his foster mother and his biological brother ("Brother"). Brother has been adopted by Foster Mother, and she is interested in adopting

---

[3] "Parenting Choices" is in fact "Pregnancy Choices."

E.H. as well. E.H. is described as a pleasant, happy child who is very attached to Brother. Brother also visits with his maternal half-siblings who are in the custody of Maternal Grandmother. E.H. has resided in this foster home since his removal from Mother on August 31, 2020.

{¶47} Caseworker visits E.H. in the foster home monthly and describes him as "very loved." He and Brother play with toys, smile, and giggle. He has his own room and his needs are being met.

{¶48} Caseworker asked Father about family placements for E.H. several times and encouraged Father to collect information on potential placements and to email the information to her. They also discussed allowing time during visitation for family members to be included. Father did not come forth with any information, though, until the motion for permanent custody was filed; then he filed a motion for change of legal custody to his mother, brother, and sister.

{¶49} The Agency reached out to these paternal relatives with letters asking whether they would like to maintain connections with E.H. through visitation, but not through placement, because E.H. is already in a kinship placement. Additional kinship studies are not generally performed when a child is already in a kinship placement. Paternal Grandmother did respond to the Agency's letter and did become involved in video visits with E.H. Caseworker testified that E.H. is placed with a relative and has made efforts to encourage ongoing communication with extended family members. T. 122-123.

{¶50} Father visits E.H. for one hour every week. Caseworker testified the visits go well generally, but Father has issues with redirection and sometimes focuses on minor

issues as E.H.'s needs change as he grows older. Father also comes to visits smelling of marijuana.

{¶51} Caseworker testified that Father clearly loves E.H. and there is a bond between father and son.

{¶52} Caseworker further testified that E.H. would benefit from adoption; the benefit of permanency outweighs severing any bond that he has with Father. E.H. deserves to have his needs met on a routine basis and to have ongoing relationships with all of his siblings.

{¶53} Caseworker further opined that an extension of time would not be in E.H.'s best interest because she has not seen case plan services which would allow her to advocate for an extension. The overall risk of harm, in her opinion as an assessor of risk, has not been reduced. Father has been provided a case plan with case plan services to demonstrate his commitment to working toward reunification with the child, including demonstrating an ability to meet this child's needs while also meeting his own. Father has not made enough progress on the case plan, in Caseworker's estimation, for the case plan to move forward. T 130-131.

{¶54} The overall risk of harm which has not been reduced is lack of engagement with case plan services leading to the inability to complete the Goodwill Parenting program and subsequent recommendations. Caseworker testified she reviewed the Lighthouse recommendations with Father in May but he didn't engage with services until August; she addressed the recommendations with him verbally, sent him a letter containing the recommendations, and the numbers he needed to call to engage in services. She sent him the amended case plan and pertinent information to engage in

services. She reviewed the information again with Father and her supervisor to clarify to him that for the Agency to advocate for reunification, she needed to see engagement. The failure to engage, much less complete the case plan in a timely manner, demonstrated a lack of commitment to E.H., in her opinion. T. 133. Father is reactive and struggles to accept feedback; Goodwill Parenting is essential to overcoming these issues because raising a child as young as E.H. is stressful. Based upon her own interactions with Father, Caseworker is not convinced that Father's responses to E.H. in a stressful situation would be appropriate. T. 133.

{¶55} If permanent custody was granted, paternal family members would still be able to have contact with E.H. T. 126.

{¶56} Paternal Uncle testified on Father's behalf and said he is a good father who wants to be involved in the lives of his children. Father has provided for his children and uses the support of his extended family when he needs to. Paternal Uncle has been married for 20 years and has three daughters; in his estimation, Father is capable of being a good parent to E.H. and his other children. Father has extended family in Ohio and also in South Carolina, all of whom are willing and able to assist him in caring for E.H. Paternal Uncle has not personally had contact with E.H. due to his job status but he will be retiring in 18 months. E.H.'s extended family including aunts, uncles, and cousins want to have contact with him.

{¶57} In the best-interest portion of the hearing, Father testified that he has had about 50 visitations with E.H. and the visits go well but are too short. He feels very bonded to E.H. He admitted he has had issues with income instability and alcohol abuse in the past, but has learned from his mistakes and is stable now. He has not been charged with

a crime since he stopped drinking. Father is willing to maintain E.H.'s relationship with Brother who currently resides with him in the foster home.

{¶58} Paternal Grandmother also testified on Father's behalf and said he is a good father to his six children. Paternal Grandmother is not seeking custody of E.H. but hopes to maintain a relationship with him regardless of the outcome of the hearing.

*Report of the Guardian Ad Litem (GAL)*

{¶59} The record contains a GAL report dated October 26, 2021, in which the GAL recommends that the trial court grants the Agency's motion for permanent custody. The report offers additional information regarding Father's other children and his criminal history. Father has two minor children including E.H. and the others are adults; Father has not raised the other children. His past criminal history includes possession of marijuana (2016), domestic violence/intimidation of attorney/victim/witness (2015) resulting in a 12-month jail sentence; drug abuse-marijuana (2014); domestic violence (2014); domestic violence (2005); and additional criminal offenses including domestic violence in the period from 1990 to 1998. The GAL report does not specify whether this offenses are merely charges or convictions, other than the 2015 domestic violence/intimidation for which he served jail time.

{¶60} The GAL report also contains further insight into Father's visitation with E.H. Father attends the weekly visits and brings needed items such as diapers, wipes, and snacks. Father "has arrived at most visits with a very strong odor of marijuana on his person or clothing." Father asks the same questions weekly, such as how much the child weighs and when is his next doctor's visit. "Father appears not to remember the information from week to week." GAL Report, 4. Foster Mother began sending a journal

each week documenting E.H.'s milestones information about the week; Father was asked to bring the journal home, read it, and return it with any questions he might have for Foster Mother. Father said he is not taking time out of his visits to write questions, but was told he could take the journal home with him to do so. Father has failed to engage with this process. Father has suggested many times that his older children and extended family members visit with E.H.; the Agency has attempted to set up family visitation times but Father has not cooperated. Father's urine screens have been positive for marijuana and Father acknowledges daily marijuana use. Father claims to have a medical marijuana card but has not produced it for the GAL.

{¶61} Father reported seizures to the GAL and said he was medicated by Coleman Professional Services, but that organization was unable to verify. Father states Coleman approved his use of marijuana for seizures.

{¶62} Father reported visits to a neurologist in Tallmadge for treatment for seizures, but the GAL was unable to locate or verify any such provider. Father was recommended to receive an updated neurological evaluation but has not done so.

{¶63} Father disputed what Caseworker and the GAL told him about Dr. Thomas' recommendations for further case services. Father became verbal and aggressive with the GAL when making his disagreement with the recommendations known. Caseworker contacted Dr. Thomas in the GAL's presence to inquire whether Thomas told Father anything different than the contents of the report; Thomas replied that she has not had any contact with Father, personally, by telephone, or otherwise, since he left her office on the day of the evaluation.

{¶64} The GAL concludes in pertinent part, "Father cannot safely protect and raise [E.H.]. Father has failed to comply with case plan services by failing to get [a] proper medical evaluation to assure [E.H.'s] safety while in Father's care." Further,

It is in [E.H's] best interest for the court to grant the agency's motion for permanent custody which will assure that [E.H.] is raised in a safe loving home with his brother, with the continued opportunity to continue bonding with his maternal family. Foster mother is willing to engage with Father and his family as she does with maternal family if the court grants the agency's permanent custody motion and she has the privilege of adopting [E.H.].

*Trial court grants permanent custody to the Agency*

{¶65} On December 21, 2021, the trial court journalized an entry granting the Agency's motion for permanent custody.

{¶66} Father now appeals from the December 21, 2021 Finding of Fact and Conclusions of Law of the Stark County Court of Common Pleas, Family Court Division.

{¶67} Father raises one assignment of error:

**ASSIGNMENT OF ERROR**

{¶68} "THE TRIAL COURT'S DECISION DENYING PLAINTIFF-APPELLANT'S MOTION TO EXTEND TEMPORARY CUSTODY PURSUANT TO O.R.C. 2151.415(D) WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE."

**ANALYSIS**

{¶69} In his sole assignment of error, Father argues the trial court should have granted his motion to extend temporary custody for the purpose of allowing him to complete case plan services. We disagree.

{¶70} Father argues that once he became aware he is conclusively E.H.'s father, he began working on case plan services: he obtained the Lighthouse parenting evaluation with Dr. Thomas and the CommQuest substance abuse evaluation. Father completed the Daybreak Treatment Program recommended by CommQuest, and did not have further substance abuse treatment recommendations.

{¶71} Regarding Thomas' Lighthouse evaluation, though, Father argues he received it on June 28, 2021, and the Agency filed for permanent custody twenty-nine days later. Although Father enrolled in Melymbrosia per the recommendation, he could not have successfully completed the program in time. Father concedes he did not enroll in and complete Goodwill Parenting, but he could not do so until Caseworker made a referral, and she could not make a referral until he completed Melymbrosia. Instead, Father argues, he completed Pregnancy Choices on his own initiative.

{¶72} Father contends the evidence admitted at the hearing demonstrates he met the conditions set forth in R.C. 215.415(D) to be granted a six-month extension of temporary custody to complete the case plan. For the following reasons, we disagree.

*Standard of review*

{¶73} R.C. 2151.415(D)(1) authorizes the trial court to extend temporary custody for six months only if it finds, by clear and convincing evidence, that such an extension is in the best interest of the child and that "there has been significant progress on the case plan of the child, and there is reasonable cause to believe that the child will be reunified with one of the parents or otherwise permanently placed within the period of extension."

{¶74} We review a trial court's decision of a motion to extend temporary custody for abuse of discretion. *Matter of C.K.,* 5th Dist. Muskingum No. CT2020-0027, 2020-Ohio-5437, ¶ 21, *citing In re E.T.*, 9th Dist. Summit No. 22720, 2005-Ohio-6087, ¶ 9.

{¶75} An abuse of discretion connotes more than a mere error in law or judgment; it implies an arbitrary, unreasonable, or unconscionable attitude on the part of the trial court. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219, 450 N.E.2d 1140 (1983). An abuse of discretion may be found where the reasons given by the court for its action are clearly untenable, legally incorrect, or amount to a denial of justice, or where the judgment reaches an end or purpose not justified by reason and the evidence. *In Re: M.M.*, 5th Dist. Stark No. 2021CA00159, 2022-Ohio-1569, ¶ 32, citing *Tennant v. Gallick*, 9th Dist. Summit No. 26827, 2014-Ohio-477, ¶ 35, additional citations omitted.

{¶76} The Agency responds that, because of the delay in scheduling the permanent custody hearing, a six-month extension of temporary custody would only have lasted until March 2022, because the original complaint was filed on August 31, 2020, and, under R.C. 2151.353(G), the Agency's temporary custody of the child would have ended on March 26, 2021, and the six-month extension would have ended on August 31, 2021. This date was only approximately ten weeks after the permanent custody hearing.

{¶77} Our inquiry, therefore, is whether Father demonstrated, by clear and convincing evidence, that an extension was in the best interest of E.H.; there was significant progress on the case plan; and there was reasonable cause to believe E.H. would be reunified with Father within approximately ten weeks. *See, In Re: M.M.*, 5th Dist. Stark No. 2021CA00159, 2022-Ohio-1569, ¶ 34.

*Requirements for award of permanent custody*

{¶78} R.C. 2151.414 sets forth the guidelines a trial court must follow when deciding a motion for permanent custody. R.C. 2151.414(A)(1) mandates the trial court schedule a hearing and provide notice upon filing of a motion for permanent custody of a child by a public children services agency or private child placing agency that has temporary custody of the child or has placed the child in long-term foster care.

{¶79} Following the hearing, R.C. 2151.414(B) authorizes the juvenile court to grant permanent custody of the child to the public or private agency if the court determines, by clear and convincing evidence, it is in the best interest of the child to grant permanent custody to the agency, and that any of the following apply:

> (a) The child is not abandoned or orphaned, has not been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, or has not been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period if, as described in division (D)(1) of section 2151.413 of the Revised Code, the child was previously in the temporary custody of an equivalent agency in another state, and the child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents;

> (b) ) the child is abandoned;

(c) the child is orphaned and there are no relatives of the child who are able to take permanent custody; or

(d) the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period * * *.

{¶80} Therefore, R.C. 2151.414(B) establishes a two-pronged analysis the trial court must apply when ruling on a motion for permanent custody. In practice, the trial court will usually determine whether one of the four circumstances delineated in R.C. 2151.414(B)(1)(a) through (d) is present before proceeding to a determination regarding the best interest of the child.

*Parental placement within a reasonable time: R.C. 2151.414(B)(1)(a)*

{¶81} The court must consider all relevant evidence before determining the child cannot be placed with either parent within a reasonable time or should not be placed with the parents. R.C. 2151.414(E). The statute also indicates that if the court makes a finding under R.C. 2151.414(E)(1)-(15), the court shall determine the children cannot or should not be placed with the parent. A trial court may base its decision that a child cannot be placed with a parent within a reasonable time or should not be placed with a parent upon the existence of any one of the R.C. 2151.414(E) factors. The existence of one factor alone will support a finding that the child cannot be placed with the parent within a reasonable time. *See In re William S.*, 75 Ohio St.3d 95, 1996-Ohio-182, 661 N.E.2d 738; *In re Hurlow*, 4th Dist. Gallia No. 98 CA 6, 1997 WL 701328 (Sept. 21, 1998); *In re Butcher*, 4th Dist. Athens No. 1470, 1991 WL 62145(Apr. 10, 1991).

{¶82} R.C. 2151.414(E) sets forth factors a trial court is to consider in determining whether a child cannot be placed with either parent within a reasonable period of time or should not be placed with the parents. Specifically, Section (E) provides, in pertinent part, as follows:

(E) In determining at a hearing held pursuant to division (A) of this section or for the purposes of division (A)(4) of section 2151.353 of the Revised Code whether a child cannot be placed with either parent within a reasonable period of time or should not be placed with the parents, the court shall consider all relevant evidence. If the court determines, by clear and convincing evidence, at a hearing held pursuant to division (A) of this section or for the purposes of division (A)(4) of section 2151.353 of the Revised Code that one or more of the following exist as to each of the child's parents, the court shall enter a finding that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent:

(1) Following the placement of the child outside the child's home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child to be placed outside the home, the parent has failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home. In determining whether the parents have substantially remedied those conditions, the court shall consider parental

utilization of medical, psychiatric, psychological, and other social and rehabilitative services and material resources that were made available to the parents for changing parental conduct to allow them to resume and maintain parental duties.

(2) Chronic mental illness, chronic emotional illness, intellectual disability, physical disability, or chemical dependency of the parent that is so severe that it makes the parent unable to provide an adequate permanent home for the child at the present time and, as anticipated, within one year after the court holds the hearing pursuant to division (A) of this section or for the purposes of division (A)(4) of section 2151.353 of the Revised Code;

\* \* \*

(16) Any other factor the court considers relevant.

{¶83} As set forth above, the trial court's findings are based upon competent credible evidence. The record includes the recommendation of the guardian ad litem for the child, and the testimony of the witnesses at trial. The trial court was in the best position to determine the credibility of the witnesses.

{¶84} In the instant case, the detailed findings in the December 21, 2021 Judgment Entry and the entire record in this matter make it apparent the trial court relied on several of the factors in R.C. 2151.414(E), including R.C. 2151.414(E)(1), failure to remedy conditions and R.C. 2151.414(E)(2), chronic mental illness or chemical dependency. See, *In re B.W.*, 5th Dist. Tuscarawas No. 2016 AP 09 0045, 2017-Ohio-605, ¶ 39, *appeal not allowed,* 149 Ohio St.3d 1409.

{¶85} The trial court noted Father was not receptive to Caseworker's recommendations, at one point stating he wasn't sure if completing the case plan was "worth it" and disbelieving what Caseworker told him about Dr. Thomas' recommendations. Father refused to sign releases and didn't start case plan services until the Agency filed for permanent custody. Despite offering numerous services, Father was unable or unwilling to mitigate the concerns that led to the child's removal and delayed the onset of case plan services necessary for him to reunite with E.H.

{¶86} A parent's successful completion of the terms of a case plan is not dispositive on the issue of reunification. *See, In Re: M.M.*, 5th Dist. Stark No. 2021CA00159, 2022-Ohio-1569, ¶ 42. The ultimate question under R.C. 2151.414(A)(1) is whether the parent has substantially remedied the conditions that caused the child's removal. *Id.,* citing *In re Schigelski*, 11th Dist. Geauga No. 99–G–2241, 2000 WL 1568388(Oct. 20, 2000). A parent can successfully complete the terms of a case plan yet not substantially remedy the conditions that caused the children to be removed—the case plan is simply a means to a goal, but not the goal itself. Hence, the courts have held that the successful completion of case plan requirements does not preclude a grant of permanent custody to a social services agency. *In re J.L.,* 8th Dist. No. 84368, 2004–Ohio–6024, ¶ 20; *In re Mraz*, 12th Dist. Nos. CA2002–05–011, CA2002–07–014, 2002–Ohio–7278. In the case of *In re: Summerfield*, 5th Dist. Stark No. 2005CA00139, 2005-Ohio-5523, this Court found where, despite marginal compliance with some aspects of the case plan, the exact problems that led to the initial removal remained in existence, a court does not err in finding the child cannot be placed with the parent within a reasonable time. *In Re: M.M.*, supra, 2022-Ohio-1569, ¶ 42.

{¶87} The evidence demonstrated Father said one thing but did another; for example, he said he was seeing a neurologist but wasn't; he came to visitation smelling of marijuana and freely admitted using it daily, but failed to produce a medical card; he reported attendance at Coleman which was in fact over 10 years ago. The concerns with Father's criminal history have not been alleviated. His statements to Caseworker indicate he lacks insight about the extent of Mother's untreated mental health issues.

{¶88} Father's defensiveness and combativeness at various stages indicate his lack of progress with case plan services. He became loud and combative with Caseworker and the GAL at times. He has been resistant to feedback and course correction at Melymbrosia, where he has not completed treatment for anger management. Father did not begin services at Goodwill Parenting but instead completed Pregnancy Choices, which the trial court reasonably found was not an equivalent substitute.

{¶89} The trial court found that, regardless of Father's compliance with aspects of his case plan, he was still not able to be a successful parent to this child or protect the child.

{¶90} We find there is competent and credible evidence to support the trial court's determination that the child cannot be placed with Father within a reasonable time or should not be placed with Father.

*Reasonable efforts*

{¶91} The Supreme Court of Ohio noted the following in *In re C.F.*, 113 Ohio St.3d 73, 78, 862 N.E. 2d 816 (2007):

> [N]o one section of the Revised Code addresses the concept
>
> of reasonable efforts. Overall, Ohio's child-welfare laws are designed

to care for and protect children, 'whenever possible, in a family environment, separating the child from the child's parents only when necessary for the child's welfare or in the interests of public safety.' R.C. 2151.01(A). To that end, various sections of the Revised Code refer to the agency's duty to make reasonable efforts to preserve or reunify the family unit. For example, R.C. 2151. 412 requires the agency to prepare and maintain a case plan for children in temporary custody with the goal 'to eliminate with all due speed the need for the out-of-home placement so that the child can safely return home.' Under R.C. 2151.413(D)(3)(b), an agency may not file for permanent custody under R.C. 2151. 413(D) - the '12 months out of 22 rule''[i]f reasonable efforts to return the child to the child's home are required under section 2151. 419' and the agency has not provided the services required by the case plan.

{¶92} A "reasonable effort" is "* * * an honest, purposeful effort, free of malice and the design to defraud or to seek an unconscionable advantage." *In re Weaver*, 79 Ohio App.3d 59, 63, 606 N.E.2d 1011(12th Dist. 1992). The issue is not whether there was anything more the agency could have done, but whether the agency's case planning and efforts were reasonable and diligent under the circumstances of the case. *In re J.D.*, 3rd Dist. Hancock Nos. 5-10-34, 2011-Ohio-1458. The child's health and safety are paramount in determining whether reasonable efforts were made. *In re R.P.*, 5th Dist. Tuscarawas No. 2011-Ohio-5378.

{¶93} R.C. 2151.419 requires the trial court to determine whether the agency filing the complaint for custody "has made reasonable efforts * * * to eliminate the continued removal of the child from his home, or to make it possible for the child to return home." Subsection (B)(1) mandates the trial court to issue written findings of fact setting forth the reasonable efforts made by the agency, including a brief description of "the relevant services provided by the agency to the family of the child and why those services did not prevent the removal of the child from his home or enable the child to return home."

{¶94} However, even where a trial court has failed to include in its judgment entry, the findings contemplated by R.C. 2151.419(B)(1) we have found that the ultimate issue is the reasonableness of the Department's efforts, and have concluded those efforts may be determined from the record. *In the matter of Kell/Bess Children*, 5th Dist. No. 97CA0278, 1998 WL 401767 (Mar. 23, 1998); *Hunt v. Ickes*, 5th Dist. Tuscarawas No. 2014 AP 08 0032, 2015-Ohio-309, ¶ 19; *In Re: M.M.*, supra, 5th Dist. Stark No. 2021CA00159, 2022-Ohio-1569, ¶ 49.

{¶95} In the instant case, we find there is competent and credible evidence to support the trial court's determination the Agency's efforts were reasonable and diligent under the circumstances of the case. The trial court found that neither parent has made significant progress on the case plan. As applicable to Father, the trial court noted the risks of Father's memory problems, his inability to regulate his emotions, his lack of insight into how his actions affect others, his lack of insight into Mother's mental health issues, and his inability to parent a young child such as E.H. have not been alleviated at all. Father was presented with the case plan and ongoing recommendations but has not followed those recommendations. The trial court noted there is an ongoing concern with

Father's behavior; Caseworker and others legitimately believe Father's behavior poses a risk to E.H.; and the trial court agrees with that belief. Father has made minimal progress to reduce risk to E.H. because there has been no true change in his ability to regulate his emotions.

{¶96} We find that the record supports that the Agency was working toward the goal of reunification and find no evidence of dishonest purpose, conscious wrongdoing, or breach of duty on the part of the Agency, which made a good faith effort to reunify Father and his child. Furthermore, the record contains clear and convincing evidence to support the court's determination that the child could not be placed with Father.

*Best interest of the child*

{¶97} An agency that seeks permanent custody of a child bears the burden of proving by clear and convincing evidence that the grant of permanent custody is in the child's best interest. *In re B.C.,* 141 Ohio St.3d 55, 2014-Ohio-4558, 21 N.E.3d 308, ¶ 26. R.C. 2151.414(D)(1) sets out a non-exhaustive list of factors the court must consider:

{¶98} R.C. 2151.414(D) requires the trial court to consider all relevant factors in determining whether the child's best interests would be served by granting the permanent custody motion. These factors include but are not limited to: (1) the interrelationship of the child with others; (2) the wishes of the child; (3) the custodial history of the child; (4) the child's need for a legally secure placement and whether such a placement can be achieved without permanent custody; and (5) whether any of the factors in divisions (E)(7) to (11) apply.

{¶99} The factors in R.C. 2151.414(E)(7) through (11), which are referred to in R.C. 2151.414(D)(1)(e), involve a parent's having been convicted of or pleaded guilty to

specific criminal offenses against the child, the child's sibling or another child who lived in the parent's household; a parent's withholding medical treatment or food from the child; a parent's repeatedly placing the child at substantial risk of harm because of alcohol or drug abuse; a parent's abandoning the child; and a parent's having had parental rights as to the child's sibling involuntarily terminated.

{¶100} No one element is given greater weight or heightened significance. *In re C.F.,* 113 Ohio St.3d 73, 2007-Ohio-1104, 862 N.E.2d 816. R.C. 2151.414(D)(1) does not require a juvenile court to make specific findings regarding each best-interest factor listed in R.C. 2151.414(D)(1) or to include in its decision or judgment entry a written discussion of each of those factors. *In re: A.M.,* Slip Opinion No. 2020-Ohio-5102, 2020WL6439610 (Nov. 3, 2020), ¶33.

{¶101} A child's best interests are served by the child being placed in a permanent situation that fosters growth, stability, and security. We have frequently noted, "[t]he discretion which the juvenile court enjoys in determining whether an order of permanent custody is in the best interest of a child should be accorded the utmost respect, given the nature of the proceeding and the impact the court's determination will have on the lives of the parties concerned." *In re Mauzy Children,* 5th Dist. No. 2000CA00244, 2000 WL 1700073 (Nov. 13, 2000), *citing In re Awkal,* 85 Ohio App.3d 309, 316, 642 N.E.2d 424 (8th Dist. 1994).

{¶102} Caseworker testified it would be in the child's best interests to be placed in the permanent custody of the Agency, and this testimony is consistent with the report of the GAL. The trial court noted E.H. has been in the same placement since his removal from Mother only days after his birth; he is placed with a biological brother whom

he adores. Foster Mother maintains a connection with Mother's extended family. E.H. is easygoing, happy, and loved.

{¶103} The Agency investigated relative placement for E.H. Caseworker asked Father for pertinent information three times, but Father did not substantively respond until the Agency filed for permanent custody. We do note the relatives were not considered for placement because the Agency deemed E.H. to already be in a kinship placement, but Father's extended family was considered for visitation. Paternal Grandmother has had video visitation with E.H.

{¶104} Regarding Father's interaction with E.H., there is a bond between father and son. Father started weekly supervised visits in January 2021 at the Agency. Father's love for E.H. is evident, although he sometimes requires redirection and will sometimes argue with staff. Rather than spend time with E.H., Father will focus upon the argument. Father comes to visitation smelling strongly of marijuana.

{¶105} Considering the many obstacles in Father's life the trial court found the child's need for a legally secure placement cannot be achieved without permanent custody.

{¶106} Nothing in the record before us demonstrates that more time or a return of custody to the Father will in any way benefit the child.

{¶107} In the present case, the trial court concluded the child's need for legally secure placement could not be achieved without awarding permanent custody to the Agency. Upon review of the record, the record supports the trial court's finding that granting the motion for permanent custody is in the child's best interest.

{¶108} In short, the juvenile court's judgment entry demonstrates that the court satisfied its statutory duty to consider the best interest factors set out in R.C. 2151.414(D)(1)(a) through (e).

{¶109} For these reasons, we find that the trial court's determination that Father had failed to remedy the issues that caused the initial removal and therefore the child could not be placed with him within a reasonable time or should not be placed with him was based upon competent credible evidence and is not against the manifest weight or sufficiency of the evidence. We further find that the trial court's decision that permanent custody to the Agency was in the child's best interest was based upon competent, credible evidence and is not against the manifest weight or sufficiency of the evidence.

{¶110} We further find that the record does not establish that there was clear and convincing evidence that a six-week extension would have been in the child's best interest, that there had been significant case plan progress, or that reunification was likely.

{¶111} Because the evidence in the record supports the trial court's judgment, we overrule Father's sole assignment of error. The decision of the Stark County Court of Common Pleas, Family Court Division is affirmed.

## CONCLUSION

{¶112}     Father's sole assignment of error is overruled and the judgment of the Stark County Court of Common Pleas, Family Court Division is affirmed.

By: Delaney, J.,

Wise, Earle, P.J. and

Baldwin, J., concur.