[Cite as *In re L.G.*, 2026-Ohio-414.]

COURT OF APPEALS
STARK COUNTY, OHIO
FIFTH APPELLATE DISTRICT

| | |
|---|---|
| IN THE MATTER OF: L.G.<br>(DOB: 12-5-18)<br><br>(Michael G., Appellant) | Case No.<br>2025CA00115<br><br>and |
| IN THE MATTER OF: M.G.<br>(DOB: 5-16-21)<br><br>(Michael G., Appellant) | Case No.<br>2025CA00116<br><br><u>Opinion & Judgment Entry</u><br><br>Appeals from the Court of Common Pleas<br>of Stark County,<br>Family Court Division,<br>Case Nos. 2024JCV00452 and<br>2024JCV00453<br><br>Judgment:   Affirmed<br><br>Date of Judgment:   February 9, 2026 |

BEFORE: William B. Hoffman; Kevin W. Popham; David M. Gormley, Judges

APPEARANCES: D. Coleman Bond, Canton, Ohio, for Appellant Michael G.; Brandon J. Waltenbaugh, Canton, Ohio, for Appellee Stark County Job & Family Services

*Gormley, J.*

{¶1}   Appellant Michael G. challenges the judgment of the Stark County Family Court awarding permanent custody of his daughters, L.G. and M.G., to Stark County Job & Family Services (the "Agency").  Michael contends that the evidence presented at the permanent-custody hearing did not support the trial court's finding that his children could not and should not be returned to him within a reasonable time, and he challenges the trial court's determination that awarding permanent custody to the Agency was in L.G.

and M.G.'s best interests.  The trial court also violated his right to counsel, Michael argues, when one of the Agency's case workers spoke with him outside the presence of his lawyer, and then that case worker talked about that conversation at the permanent-custody hearing.  For the reasons explained below, we affirm the judgment of the trial court.

**The Key Facts**

{¶2}  A lengthy history exists between the Agency and Sarah S., who is the mother of both L.G. and M.G.  Michael is the purported father of L.G., and he is the established father of M.G.

{¶3}  In 2021, the Agency filed its first complaints concerning the care of L.G. and M.G. due to issues tied to their mother's use of drugs as well as the instability of her housing.  The Agency at that time also voiced its concerns regarding Michael's use of illegal drugs.  Though the 2021 case ended with the girls being returned to the custody of their mother Sarah, Michael's failure to complete some parts of his case plan — including the directive that he acknowledge paternity for L.G. or undergo genetic testing to establish that child's paternity — led the Agency to caution the girls' mother against permitting Michael to participate in unsupervised visits with them.

{¶4}  In early 2024, the Agency received reports that Sarah was again abusing illegal drugs, was residing at a homeless shelter, and was associating with known drug users.  After trying without success to assist Sarah outside of a formal court proceeding, the Agency in May 2024 filed its second round of complaints claiming that L.G. and M.G. were dependent and neglected.  Those complaints again primarily focused on Sarah's substance-use issues and her housing instability, but the Agency also listed Michael's

homelessness as a concern.  Just before those 2024 complaints were filed, the Agency discovered that the girls were in the physical custody of the foster family that had cared for them during the pendency of the 2021 case.

{¶5}    The trial court granted the Agency's request to take immediate custody of L.G. and M.G. pending a shelter-care hearing to be held the following day.  Michael later agreed to a finding of dependency at an adjudicatory hearing held in July 2024, and the trial court then awarded temporary custody of the children to the Agency.  The Agency formally placed the girls with the same foster family from the 2021 case.

{¶6}    Next, the Agency created a case plan that was approved and adopted by the trial court to aid in Michael's anticipated reunification with his children.  That case plan called for Michael to undergo a substance-use assessment and follow any resulting recommendations, submit to random drug tests to verify that he was not using illegal drugs, acknowledge or establish paternity for L.G., maintain his current employment, and find stable housing.

{¶7}    A review hearing held in November 2024 indicated that Michael was engaged in substance-use treatment and had been compliant with his drug screens.  The trial court noted, though, that Michael had tested positive for marijuana use, was refusing to establish paternity for L.G. because he did not want to pay child support, and had still not secured independent housing.  The court maintained the conditions as they existed at the time of the review hearing, leaving L.G. and M.G. in the care of their foster family and ordering Michael to continue making progress on his case plan.  The next review hearing was scheduled for April 2025.

{¶8} In January 2025, Michael — according to his later testimony at the permanent-custody hearing as well as the testimony of an Agency case worker — informed that case worker that, because he had no outside support and because of his financial situation, he was unable to properly care for L.G. and M.G. He expressed during that conversation that it would be in the girls' best interest to stay with their foster family. Michael stated, too, that he was not interested in having any additional services added to his case plan because he could not afford the cost of participating in them. The Agency's case worker testified at the June 2025 permanent-custody hearing that she learned approximately one week before that hearing that Michael had by then changed his position and did want to retain custody of his children.

{¶9} In March 2025, the Agency filed a motion asking the court to grant permanent custody of L.G. and M.G. to the Agency, alleging — among other things — that those children could not be placed with Michael within a reasonable time and that awarding permanent custody of them to the Agency was in their best interests.

{¶10} Though Michael had obtained a two-bedroom apartment by the time the April review hearing was held, the court noted then that he had missed 15 drug tests, had tested positive for marijuana use, and was only "somewhat" visiting with the girls. The trial court again maintained L.G. and M.G.'s placement with their foster family, ordered Michael to continue working on his case plan, and set the permanent-custody hearing for June 2025.

{¶11} After considering the evidence presented at that latter hearing, the trial court awarded permanent custody of the girls to the Agency. Michael now appeals.

## The Trial Court Did Not Err by Granting Permanent Custody of L.G. and M.G. to the Agency

{¶12} In his first assignment of error, Michael argues that the Agency failed to establish both that there were grounds for permanent custody and that an award of permanent custody to the Agency was in L.G. and M.G.'s best interests. Because Michael combines a sufficiency-of-the-evidence argument with a manifest-weight argument, we will attempt to address his concerns related to each issue as we understand them from his brief.

{¶13} The Supreme Court of Ohio has explained that the appropriate appellate standard of review of a trial court's permanent-custody decision is a manifest-weight review or a sufficiency-of-the-evidence review (or both), depending on the nature of the arguments presented by the parties. *In re Z.C.*, 2023-Ohio-4703, ¶ 11. Though they are sometimes, as here, lumped together in a single argument, those two concepts are "'both quantitatively and qualitatively different.'" *Id.* at ¶ 13, quoting *Eastley v. Volkman*, 2012-Ohio-2179, ¶ 10.

{¶14} Under a manifest-weight review, an appellate court must "weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether, in resolving conflicts in the evidence, the finder of fact clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed and a new trial ordered." *Id.* at ¶ 14. Our review of a sufficiency-of-the-evidence challenge, on the other hand, "is generally limited to considering whether sufficient credible evidence exists to support the juvenile court's determination." *In re D.P.*, 2020-Ohio-6663, ¶ 13 (12th Dist.).

**{¶15}** A trial court "may grant permanent custody of a child to a movant if the court determines . . . by clear and convincing evidence, that it is in the best interest of the child to grant permanent custody of the child to the agency" and that any one of the five factors enumerated in R.C. 2151.414(B)(1)(a) through (e) applies. R.C. 2151.414(B)(1). R.C. 2151.414(B), therefore, "establishes a two-pronged analysis." *In re K.H.*, 2025-Ohio-21, ¶ 30 (5th Dist.). "In practice, the trial court will usually determine whether one of the . . . circumstances delineated in R.C. 2151.414(B)(1)(a) through [(e)] is present before proceeding to a determination regarding the best interest of the child." *Id.*

**{¶16}** Clear and convincing evidence is evidence that "'will produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established.'" *Id.* at ¶ 26, quoting *Cross v. Ledford*, 161 Ohio St. 469 (1954), paragraph three of the syllabus. "'Where the proof required must be clear and convincing, a reviewing court will examine the record to determine whether the trier of facts had sufficient evidence before it to satisfy the requisite degree of proof.'" *In re Z.C.*, 2023-Ohio-4703, at ¶ 8, quoting *State v. Schiebel*, 55 Ohio St.3d 71, 74 (1990).

**A. The Record Supports the Trial Court's R.C. 2151.414(B)(1)(a) Finding**

**{¶17}** R.C. 2151.414(B)(1) lists five scenarios, any one of which can serve as a prerequisite for a trial court's consideration of a permanent-custody request. "As long as one of these factors is present, then the first prong of the test is satisfied." *In re A.S.*, 2024-Ohio-2099, ¶ 36 (5th Dist.). The trial court here relied on R.C. 2151.414(B)(1)(a), which applies when the "child is not abandoned . . . and the child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents."

**{¶18}** To determine, under R.C. 2151.414(B)(1)(a), whether a child cannot be placed with a parent, a court must look to R.C. 2151.414(E). That section in turn lists 16 possible scenarios, any one of which can support a trial court's finding that a child cannot be placed with either parent. "The existence of one factor alone will support a finding that the child cannot be placed with the parent within a reasonable time." *In re A.W.*, 2024-Ohio-5791, ¶ 19 (5th Dist.).

**{¶19}** The trial court in this case found that R.C. 2151.414(E)(1) was the factor supporting a finding that L.G. and M.G. cannot be placed with their father, and Michael now challenges that determination. That statutory provision tells us that a child cannot be returned to a parent within a reasonable time when "[f]ollowing the placement of the child outside the child's home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child to be placed outside the home, the parent has failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home."

**{¶20}** A court must consider "all relevant evidence" when determining if a child cannot or should not be placed with a parent within a reasonable period of time. R.C. 2151.414(E); *In re J.G.S.*, 2019-Ohio-802, ¶ 27 (1st Dist.) ("Under R.C. 2151.414, the court is required to look at all relevant evidence, including a parent's pattern of conduct."); *In re Stephens*, 2002-Ohio-3057, ¶ 27 (7th Dist.) ("To further the interests of the children, the court must consider any evidence available to it, including a parent's pattern of conduct. Some of the most reliable evidence for the court to consider is the past history of the children and the parents.").

{¶21} The concerns underlying the Agency's 2024 involvement, though initially focused on Sarah's conduct because both L.G. and M.G. were in her custody then, included Michael's homelessness. Michael's case plan was designed to address that concern by requiring him to complete a substance-use assessment, to participate in random drug tests, to maintain his employment, and to obtain housing. Michael was also directed to establish paternity for L.G. The Agency's case worker later testified that to assist Michael in completing those case-plan steps, that worker was willing to provide bus passes, meet with him to administer the drug tests, offer case-management services, and meet with Michael every month to answer any questions from him.

{¶22} The trial court heard testimony at the permanent-custody hearing that Michael was inconsistent with drug testing throughout the life of the case and had missed 23 drug-testing appointments. While the Agency's case worker testified at the hearing that she did not suspect that Michael was using illegal drugs, the trial court noted in its judgment entry that missed drug screens are presumed to be positive results. And though Michael testified that his inconsistent attendance at drug-testing appointments resulted from the high cost of transportation, the Agency's case worker testified that to assist Michael in completing his case plan, she had offered to provide bus passes or meet elsewhere with him for the drug tests. That case worker testified, too, that Michael had failed to establish paternity for L.G. by the time that the permanent-custody hearing was held despite Michael having been ordered to establish paternity both in the 2021 case and in the present case. Michael testified that his failure to establish paternity was due in part to transportation issues as well as his efforts to save money so that he could secure appropriate housing where he could live with the girls.

**{¶23}** On his housing situation, Michael testified at the hearing that in December 2024, he had obtained a two-bedroom apartment and that his girlfriend was living there with him. In support of her opinion that Michael had not sufficiently remedied the conditions causing L.G. and M.G. to be placed outside of his care despite securing that apartment, the case worker expressed concerns about Michael's girlfriend's drug use and her prior involvement with the Agency regarding the care of her own children. The case worker answered "yes" to the trial court's question about whether Michael's choice to live "with a girlfriend with drug concerns and concerns regarding history with children services" could adversely affect the stability of his housing. Michael testified that he was willing to make his girlfriend move out of his apartment if that was a prerequisite for reunifying with his children.

**{¶24}** Finally, the Agency's case worker testified that around January 2025, Michael told her that he was financially unable to care for the girls and that it would be in their best interests to remain with their foster family. That Agency staffer also testified that the Agency would have likely added parenting classes to Michael's case plan once he had obtained stable housing, but no effort was made to amend the case plan because Michael stated that he could not pay the cost to participate in those classes.

**{¶25}** As for Michael's perspective on his January 2025 remark about the girls' best interests, he explained at the permanent-custody hearing that he believed at the time that even if the foster family were granted legal custody of the girls, he would still retain his parental rights. Michael stated in unequivocal terms during his permanent-custody-hearing testimony that he did not want his parental rights to be terminated.

**{¶26}** After weighing all of these matters and after examining the full record from the hearing, we find that the trial court's conclusion on the first prong of the two-part permanent-custody test was correct: Clear and convincing evidence in the record supports a finding that Michael — despite reasonable case-planning services from the Agency — failed to remedy the conditions causing L.G. and M.G. to be placed outside of Michael's care. Michael has refused since 2021 to establish paternity for L.G. because he does not want to pay additional child support. While Michael had obtained a two-bedroom apartment, the trial court noted in its permanent-custody judgment entry that Michael was residing there with an individual who had a history of children's services involvement, did not have custody of her own children, and had recently been released from community-control supervision for some criminal charges. Michael himself acknowledged that he was "having a hard time" financially, and he testified at the hearing that he could not afford childcare for the girls. And though he testified that he did not want his parental rights terminated, Michael offered no testimony to support his claim that he is now able to afford to care for L.G. and M.G.

**{¶27}** We conclude, too, that the trial court's R.C. 2151.414(E) finding was not against the manifest weight of the evidence. Michael does not identify any evidentiary conflict that he believes the trial court lost its way in resolving, and in fact the testimony presented at the hearing by the Agency's case worker was largely consistent with Michael's own testimony. Both witnesses acknowledged that Michael was struggling financially, had missed several drug tests, had obtained a two-bedroom apartment where he was living with his girlfriend, and had failed to establish paternity for L.G.

**{¶28}** Michael did not deny that he made the January 2025 statement to the Agency's case worker regarding his then-existing opinion on permanent custody. Michael also did not challenge the case worker's concerns regarding his live-in girlfriend, instead claiming that she would be "gone tomorrow" if necessary. And despite his argument that the trial court impermissibly "cherry picked" only those facts presented by the Agency's case worker that reflected poorly on Michael, the trial court, as the trier of fact, was indeed permitted to "believe all, part[,] or none of the testimony of any witness" who appeared before it. *State v. Vogelsong*, 2025-Ohio-5107, ¶ 33 (5th Dist.).

**{¶29}** In support of his contrary view that the trial court's finding was wrong, Michael contends that the trial court was limited to considering only the issue of his housing instability in reaching its R.C. 2151.414(E) conclusion because that was the only condition that the Agency initially identified in connection with Michael that prompted the initial removal of the two girls. The trial court therefore erred, he argues, by considering other evidence — testimony about his girlfriend living in his apartment and his lack of interest in completing additional case-plan services — unrelated to Michael's housing situation. Michael argues, too, that evidence regarding his case-plan completion entitled him to a finding that his children could be returned to him within a reasonable time.

**{¶30}** Our court has previously explained, however, that "a finding under R.C. 2151.414(E) is not exclusive to the concerns raised at the time of the initial removal." *In re J.S.*, 2017-Ohio-4104, ¶ 34 (5th Dist.). As explained above, R.C. 2151.414(E) requires a trial court to consider all relevant evidence in reaching its conclusion under that statutory provision. Though Michael had obtained an apartment, the trial court properly considered

testimony about the possible impact of his girlfriend's presence on the stability of that housing.

{¶31} Nor did the trial court err by considering Michael's statement to the Agency's case worker that he did not have any interest in completing additional case-plan services because he could not afford to pay for them. We do not view the trial court's factual acknowledgement of that statement as "penalizing" Michael for failing to complete a service that was never added to his case plan. Instead, we view the trial court's reference to that testimony as a proper reflection of the fact that the trial court was permitted to consider all relevant evidence about Michael's financial circumstances and how those circumstances might affect his ability to provide a stable home for his children.

{¶32} Further, completing the objectives of his case plan would not automatically have entitled Michael to reunification with L.G. and M.G. *In re A.F.*, 2022-Ohio-3753, ¶ 46 (5th Dist.) ("A parent's successful completion of the terms of a case plan is not dispositive on the issue of reunification . . . the case plan is simply a means to a goal, but not the goal itself."); *In re E.B.*, 2010-Ohio-1122, ¶ 30 (12th Dist.) ("it is well-settled that the completion of case plan services alone does not equate to, or necessitate a finding that the parents have substantially remedied the conditions that caused the removal of the child from the home").

{¶33} The trial court therefore did not err by concluding that Michael had failed to substantially remedy the conditions causing L.G. and M.G. to be removed from his care and finding that the girls could not be returned to Michael within a reasonable time.

**B. Granting Permanent Custody of L.G. and M.G. to the Agency is in Their Best Interests**

**{¶34}** Michael argues here that the trial court's findings related to L.G. and M.G.'s best interests do not correlate with the factors set forth in R.C. 2151.414(D)(1).

**{¶35}** In determining whether granting permanent custody of a child to an agency is in that child's best interest, the trial court must consider all relevant factors, including, but not limited to, the ones listed in R.C. 2151.414(D)(1). Those statutory factors include the child's interactions and relationships with the child's family members and other persons who may significantly affect the child, the wishes of the child (with due regard to the maturity of the child), the custodial history of the child, and the child's need for a legally secure placement and whether that type of placement can be achieved without a grant of permanent custody to the agency.

**{¶36}** While the trial court must consider all of the factors in R.C. 2151.414(D)(1), the court is required to consider, too, any other evidence available to it when deciding whether permanent custody is in a child's best interest. *In re Schaefer*, 2006-Ohio-5513, ¶ 56 ("The court must consider all of the elements in R.C. 2151.414(D) as well as other relevant factors."); *In re Stephens*, 2002-Ohio-3057, at ¶ 27 (7th Dist.) ("To further the interests of the children, the court must consider any evidence available to it" when "determining whether permanent custody is in the children's best interests"). R.C. 2151.414(D)(1) does not require a trial court to make specific findings on each factor listed in that provision, nor does it require the court to include in its judgment entry a written discussion of each factor. *In re A.M.*, 2020-Ohio-5102, ¶ 31, 33 ("Consideration [of the factors] is all the statute requires.").

**{¶37}** "A child's best interests are served" when the child is placed in a permanent situation that "fosters growth, stability, and security." *In re M.K.*, 2023-Ohio-3786, ¶ 36 (5th Dist.). "'The discretion'" that the juvenile court enjoys in determining whether an order of permanent custody is in the best interest of a child "'should be accorded the utmost respect, given the nature of the proceeding and the impact the court's determination will have on the lives of the parties concerned.'" *Id.*, quoting *In re E.H.*, 2022-Ohio-1682, ¶ 101 (5th Dist.).

**{¶38}** The permanent-custody judgment entry demonstrates that the trial court did properly consider the R.C. 2151.414(D)(1) factors. Michael appears to argue, though, that the trial court was limited to considering only those factors enumerated in the statute. Yet as explained above, the trial court was required to consider *all* relevant factors.

**{¶39}** Clear and convincing evidence supported the trial court's conclusion that the girls' best interests would be served by granting permanent custody to the Agency. According to the case worker's testimony, though L.G. and M.G. had bonded with Michael and though their father-child visits had gone smoothly, the girls were also bonded with their foster parents and the foster parents' two biological children, and L.G., M.G., and the foster family were functioning well as a family unit. The case worker described the foster parents as patient, loving, and attentive to L.G. and M.G.'s needs and testified that the girls refer to their foster parents as "mom" and "dad." The children had been placed with the foster family for over one year when the prior case filed by the Agency had been open, and that foster family continued to provide care for L.G. and M.G. on the weekends even after that first case had been resolved. Michael himself acknowledged at the permanent-custody hearing that his children do well with their foster family.

{¶40}  In addition, L.G. — who was six years old at the time of the final hearing in the trial court — had received positive feedback from her kindergarten teachers, and the case worker testified that L.G. would remain in that same school district if permanent custody were awarded to the Agency.  The trial court found that the foster family was meeting L.G. and M.G.'s educational and medical needs, and the case worker testified that the foster family was interested in adopting both girls.

{¶41}  We find, too, clear and convincing evidence that, because of Michael's admitted financial struggles and because of the Agency's concerns about the impact that Michael's girlfriend's presence has on the stability of his housing, no safe and stable home would be available to L.G. and M.G. absent a grant of permanent custody to the Agency. The Agency's case worker testified that the foster family could provide L.G. and M.G. with the safety and security that they have been lacking in their lives since 2021.  The guardian ad litem also testified that a permanent-custody grant would be in L.G. and M.G.'s best interests.

{¶42}  The best-interest factors weigh in favor of the trial court's decision to grant permanent custody of L.G. and M.G. to the Agency.  Because both prongs of the permanent-custody test have been shown in this case, we find that the trial court properly terminated Michael's parental rights and appropriately placed the girls in the permanent custody of the Agency.  Michael's first assignment of error is overruled.

**The Trial Court Did Not Violate Michael's Right to Counsel**

{¶43}  Michael argues in his second assignment of error that the trial court violated his right to counsel by finding that his January 2025 conversation with the Agency's case

worker — in which he opined that it would be in his children's best interests to be adopted by their foster parents — "constituted an agreement as to permanent custody."

{¶44} R.C. 2151.352 afforded Michael the right to representation by legal counsel at L.G. and M.G.'s permanent-custody hearing, and that same provision entitled him to appointed counsel if he could not afford to retain his own attorney. The trial court did in fact appoint Michael's current appellate counsel to represent him in the permanent-custody proceeding, and Michael was represented by that attorney not only at the permanent-custody hearing but also throughout the 13-month period before that hearing.

{¶45} Michael's denial-of-the-right-to-counsel argument misses the mark. First, nowhere in the trial court's judgment entry did the court find, as Michael argues, that he agreed to permanent custody. While the trial court acknowledged in its findings of facts that Michael, during a January 2025 conversation with the case worker, "expressed to the case worker that it was in the best interest of the children to be adopted by the foster parents," the court noted, too, that Michael "has had a recent change of heart." And Michael made clear at the permanent-custody hearing that he did not want his parental rights to be terminated. The Agency's case worker testified then, too, that Michael had recently changed his position. Michael's January 2025 out-of-court statement, in other words, was not viewed by the trial court as some sort of unalterable expression of his views about permanent custody, and the trial court heard and acknowledged the contrary perspective that he had embraced by the time the permanent-custody hearing occurred.

{¶46} Second, Michael does not point to any authority supporting his view that he was entitled to his counsel's presence when he voluntarily engaged in an informal out-of-court conversation with an Agency case worker.

**{¶47}** The trial court did not err by considering Michael's January 2025 statement about permanent custody when the court was weighing whether L.G. and M.G. should be returned to his care and whether doing so would be in their best interests. Michael's second assignment of error is overruled.

**{¶48}** For the reasons explained above, the judgments of the Family Court Division of the Court of Common Pleas of Stark County are affirmed. Costs in both appeals are to be paid by Appellant Michael G.

By: Gormley, J.;

Hoffman, P.J. and

Popham, J. concur.