[Cite as *In re D.H.*, 2022-Ohio-4495.]

COURT OF APPEALS
LICKING COUNTY, OHIO
FIFTH APPELLATE DISTRICT

|  |  |  |
|---|---|---|
|  | : | JUDGES: |
|  | : |  |
|  | : | Hon. Earle E. Wise, Jr., P.J. |
|  | : | Hon. John W. Wise, J. |
|  | : | Hon. Patricia A. Delaney, J. |
| IN RE D.H. | : |  |
|  | : | Case No. 2022 CA 00025 |
|  | : |  |
|  | : |  |
|  | : |  |
|  | : |  |
|  | : |  |
|  | : | O P I N I O N |

CHARACTER OF PROCEEDING: Appeal from the Licking County Court of Common Pleas, Juvenile Division, Case No. F2018-0840

JUDGMENT: AFFIRMED

DATE OF JUDGMENT ENTRY: December 13, 2022

APPEARANCES:

For LCDJFS-Appellee:

WILLIAM C. HAYES
LICKING COUNTY PROSECUTOR

J. BRANDON PIGG
65 E. Main Street, 3rd Floor
Newark, OH 43055

For Father-Appellant:

CAROLYNN E. FITTRO
35 S. Park Place, Suite 202
Newark, OH 43055

For Mother-Appellant:

ROBIN LYN GREEN
P.O. Box 157
Newark, OH 43058

*Delaney, J.*

{¶1} Father-Appellant, M.S. appeals the April 6, 2022 judgment entry of the Licking County Court of Common Pleas, Juvenile Division awarding permanent custody of D.H. to Licking County Department of Job and Family Services-Appellee. Mother-Appellant, J.H. has filed a related appeal of the April 6, 2022 judgment entry in *In re D.H.*, 5th Dist. Licking Case No. 2022 CA 00028.

## FACTS AND PROCEDURAL HISTORY

### The Children

{¶2} Mother-Appellant, J.H. is the biological mother of G.H., born in January 2005; D.K. born in September 2007; and D.H., born in December 2018.

{¶3} Father-Appellant, M.S. is the biological father of D.H. Father and Mother are not married.

{¶4} The putative fathers of G.H. and D.K. have not appeared in any of the juvenile court or appellate court proceedings.

### Complaints for Dependency

{¶5} Since 2017, there had been three investigations by the Licking County Department of Job and Family Services-Appellee ("LCDJFS") with Mother due to allegations of Mother's drug use. The cases were investigated and closed. In September 2018, LCDJFS again became involved with Mother and Father based on a series of incidents of domestic violence between the two. Mother was seven months pregnant with D.H. at the time of the investigation. G.H. witnessed the domestic violence. On October 4, 2018, Father was indicted on one count of Domestic Violence, a fifth-degree felony.

{¶6} On October 22, 2018, Father allegedly attacked Mother and G.H. intervened. Father choked G.H. resulting in Mother stabbing Father in the back with cuticle scissors. Both Mother and Father were arrested and placed in jail. Father was charged with Intimidation of a Witness, a third-degree felony; Attempted Felonious Assault, a third-degree felony; Domestic Violence, a fifth-degree felony; and Domestic Violence, a first-degree misdemeanor. The Intimidation charge was based on Father's attempts to persuade Mother not to pursue charges against him.

{¶7} Mother was released from jail. After she was released, Mother refused to file a civil protection order against Father for herself and G.H. She also refused services from LCDJFS. While Father was ordered to have no contact with Mother, Father and Mother continued to communicate with each other. It appeared Mother had no independent source of income and there were concerns about her drug use.

{¶8} On November 9, 2018, LCDJFS filed a motion for a temporary order granting LCDJFS emergency shelter care and custody of G.H. and D.K. LCDJFS simultaneously filed complaints for dependency alleging that G.H. and D.K. were dependent children. The Licking County Juvenile Court granted LCDJFS emergency shelter care of G.H. and D.K. A Guardian ad Litem was appointed for the children.

{¶9} On December 11, 2018, the juvenile court granted an emergency ex parte order of removal for D.H. LCDJFS filed a complaint for dependency for D.H. on December 12, 2018. Pending adjudication, LCDJFS was granted emergency shelter care custody of D.H.

{¶10} An uncontested adjudicatory hearing was held on January 9, 2019, where the juvenile court adjudicated G.H., D.K., and D.H. as dependent children. Mother and

Father were present at the adjudicatory hearing and represented by counsel. An uncontested dispositional hearing was held on February 25, 2019, where the children were placed in the temporary custody of LCDJFS.

{¶11} The matter proceeded to a five-day hearing before the Magistrate, starting on January 29, 2021, where the Magistrate took evidence on the following motions:

a. A.S. ("Paternal Great Aunt") Motion for Legal Custody as to D.H.

b. LCDJFS Motion for Permanent Custody as to D.K. and D.H. filed on October 9, 2020.

c. LCDJFS October 9, 2020 Motion to Modify Disposition as to G.H. to a Planned Permanent Living Arrangement ("PPLA").

d. Mother's Motion for Extended Visitation.

e. Mother's Motion for Return of Legal Custody.

f. LCDJFS March 3, 2021 Motion for Permanent Custody and Motion to Withdraw Motion to Modify Disposition as to G.H.

g. LCDJFS April 20, 2021 Motion to Withdraw Permanent Custody and Motion to Modify Disposition for PPLA as to G.H.

h. LCDJFS May 12, 2021 Motion to Consider Permanent Custody and PPLA as alternative pleadings.

{¶12} The following evidence was adduced at the hearing.

### Mother's Case Plan

{¶13} LCDJFS created a case plan for Mother and Father. There were challenges working with Mother and Father based on Mother and Father's threats of violence against their case workers and Mother's failure to communicate with specific case workers.

{¶14} Mother's case plan objectives were to address the concerns that led to the removal of the three children. She was to complete a substance abuse assessment and follow all recommendations; complete random drug and alcohol screens; do not associate with persons who abuse substances or engage in criminal conduct; participate in counseling services, including domestic violence support groups; and obtain and maintain independent housing and legitimate income sufficient to meet the needs of the children.

{¶15} Mother initially engaged in mental health treatments at the National Youth Advocacy Program in November 2018. She transferred to The Woodlands in January 2019, and then returned to the National Youth program in May 2019. Mother engaged in counseling from May 28, 2019 to June 8, 2020. Mother was diagnosed with Adjustment Disorder, Other Specified Trauma, Post Traumatic Stress Disorder, Anxiety, and Depression. LCDJFS could not monitor Mother's participation in mental health treatment because Mother refused to sign releases of information. During her mental health treatment, Mother did not fully discuss the breadth of the domestic violence between her and Father. Mother continued to have telephone contact with Father while they were incarcerated, as a result of which the calls were recorded. Mother stated they discussed the children and legal matters. A review of the phone calls showed that Mother and Father stated their love for each other, the desire to have another child, and screaming arguments.

{¶16} Mother completed a substance abuse assessment and received substance abuse education. A random drug screen tested positive for cocaine and opiates. Mother denied her substance abuse or abusing alcohol, despite being observed to be extremely

intoxicated. During the recorded phone calls, Mother admitted to purchasing heroin for her mother.

{¶17} At the time of the children's removal, Mother was not working and experiencing housing instability. In May 2019, Mother had obtained an apartment in Zanesville, Ohio. She remained unemployed, however, working sporadically at construction jobs with her brother. Mother obtained employment at Speedway, which ended in March 2020. Mother relocated to her mother's home, but there were concerns that housing was not stable. Further, the police had been called to the mother's home due to their disputes, which resulted in Mother's arrest on July 18, 2021 for allegedly punching and biting her mother. The police also found a 12-gauge, sawed-off shotgun in the home. When Mother was arrested, the arresting officer observed Mother to be intoxicated. She was screaming, hostile, and verbally abusive to the officers. Mother was hospitalized and sedated.

{¶18} On July 30, 2020, Mother was indicted on one count of Felonious Assault (F2) and one count of Unlawful Possession of Dangerous Ordnance-Illegally Manufacturing or Processing Explosives (F5). After a jury trial where Mother represented herself and her mother did not appear as a witness, the jury found Mother guilty of Unlawful Possession of Dangerous Ordnance. Mother was sentenced to 300 days in jail (with jail time credit of 242 days) and two years of community control sanctions. Mother objected and requested to be sentenced to jail rather than community control sanctions, which the trial court sustained. She was scheduled to be released on May 14, 2021.

**Father's Case Plan**

{¶19} Father's case plan was to address the concerns that led to the removal of D.H. He was to complete a substance abuse assessment and follow all recommendations; complete random drug and alcohol screens; do not associate with persons who abuse substances or engage in criminal conduct; participate in counseling services, including The Woodlands' Batter's Intervention Program; and obtain and maintain independent housing and legitimate income sufficient to meet the need of the child.

{¶20} Father was diagnosed with Bipolar Disorder Type II and prescribed medication.

{¶21} Father was initially placed in the community subject to pre-trial bond conditions at which time he pursued reunification. He completed a substance abuse assessment and was deferred for service. Father relapsed on heroin in approximately January or February 2019. He then pursued treatment at Muskingum Behavioral Health. He did not participate in The Woodlands' Batter's Intervention Program due to his pending criminal matters.

{¶22} On July 15, 2019, Father plead guilty and was convicted of domestic violence, intimidation of a witness, domestic violence (F5), domestic violence (F5), and domestic violence (M1). He was sentenced to an aggregate prison term of 18 months incarceration. He was in prison during the COVID-19 pandemic where the programming was limited, but he attended a faith-based substance abuse program.

{¶23} Father and Mother regularly communicated with each other by telephone while Father was incarcerated, so the calls were recorded. The phone calls were hostile

and manipulative; at other times, they expressed their love for each other. It was during these phone calls Father and Mother made threats of violence against their case workers.

{¶24} Father was released from prison on November 8, 2020. Father made efforts to reengage his case plan. He engaged in parenting education through Forever Dads in Zanesville, pursued mental health counseling, and obtained housing. As a condition of Father's parole, he was not to have any contact with Mother or unsupervised contact with D.H. By November 23, 2020, Father was incarcerated again due to a parole violation after he continued daily telephone contact with Mother.

{¶25} Father was released from prison on January 8, 2021. He was arrested shortly thereafter due to his continued prohibited contact with Mother. In one recorded incident, Father contacted Mother during a video visit on January 13, 2021, while Mother was incarcerated at the Licking County Justice Center. A third-party appeared on the screen, moving his mouth, while Father remained out of camera view and spoke directly to Mother.

{¶26} The Adult Parole Authority recommended that Father serve a sanction of 160 days in prison for the violation. Father's parole officer found Father to be non-compliant with parole and borderline aggressive. Father made statements to his parole officer that he understood why people like him committed mass shootings.

**Foster Placement, Visitation, and Parental Relationships**

{¶27} Upon G.H.'s removal, he was placed in a family foster home with D.H. and D.K. On September 27, 2019, G.H. was placed at the Mohican Young Star Academy because of an incident of theft. While in this residential placement, G.H. assaulted a peer and was found to purposefully "cheek" his mental health medication. G.H. improved, was

discharged from the facility, and placed in a family foster home in November 2020. He began attending bi-weekly therapy. He at first wanted to return to Mother's care or to be placed with relatives in Louisiana, then he expressed a desire to be adopted. On March 18, 2021, G.H. ran away from his foster home. On April 18, 2021, G.H. was arrested and charged as a juvenile with Aggravated Robbery with a gun specification (F1) and Theft of a Motor Vehicle (F4). Since his arrest, G.H. was incarcerated at the Multi-County Juvenile Detention Center.

{¶28} D.K. was placed in a family foster home with D.H. and G.H. D.K. relocated in July 2019 and remained in her second family foster home until July 9, 2020. The second foster family became unavailable due to marital discord and D.K. was placed with a third family foster home from July 9, 2020 to December 11, 2020. While at the third foster home, Mother was contacting D.K., which correlated to D.K.'s increased negative behaviors and mental health. In December 2020, D.K. chose to be placed with G.H.'s foster family. Then G.H. ran away from the foster home. D.K. remained with the foster family who has expressed an interest in maintaining their relationship and possibly adopting her. D.K. attended weekly counseling and was improving.

{¶29} D.H. has also had multiple foster family placements. He left his initial placement in February 2019 and remained with the second foster family home until April 6, 2021, when the foster father experienced mental health issue. D.H. resides in a foster to adopt home, but it is unknown whether he will be adopted. Due to his age and custodial history, D.H. was not bonded with his siblings, Mother, or Father.

{¶30} Father attended supervised bi-weekly visitation sessions with D.H. Father visited D.H. on May 10, 2019 and was then incarcerated. Father attended a supervised visitation with D.H. on November 20, 2020. This was Father's last visitation with D.H.

{¶31} Prior to Mother's incarceration, she attended supervised biweekly visitation with the children. She was a vocal advocate for the care of the children during visitation but was argumentative with the LCDJFS staff. Mother last saw all three children together on March 2, 2020. Mother had difficulty complying with the COVID-19 regulations for visitation. In May 2020, Mother was prohibited from visiting with D.K. because Mother would not comply with the rules, and she hid money in D.K.'s backpack.

{¶32} After Mother moved to the Zanesville apartment in May 2019, Father reported to LCDJFS that G.H. was not at his foster home, but with Mother at her apartment. There were concerns that G.H. would remove D.H. from his foster home. During Mother's supervised visitation with G.H. and D.H., LCDJFS sat in the room because of the flight concerns. Mother denied that G.H. was with her, but on May 12, 2021, Mother admitted that G.H. and his friend were in her apartment.

{¶33} Mother's last contact with D.H. was in July 2020. Mother's last contact with G.H. was June 2020, via Zoom, while G.H. was attending the Mohican Young Star Academy. Mother pursued unauthorized contact with D.K. and G.H. while Mother was incarcerated by sending letters to the children under the name of a different inmate.

{¶34} The juvenile court conducted in camera interviews with G.H. and D.K. D.H. was too young to participate. The children expressed they did not want contact with Father because they were afraid of him.

**Kinship Placements**

{¶35} Paternal Great Aunt moved for legal custody of D.H. She had never met D.H. and no relationship with him. She did not have a relationship with Mother but remained in contact with Father and identified as his support person. The LCDJFS Kinship Care Coordinator found Paternal Great Aunt to have a significant Children's Services history. In January 2019, the eight-month-old infant granddaughter of Paternal Great Aunt was found severely injured in her home that she shared with the father of the infant. Paternal Great Aunt returned home from work and discovered the infant had difficulty breathing. She took the infant to the emergency room and the infant was diagnosed with nine fractured ribs, three skull fractures, a lacerated spleen, and a lacerated liver. The perpetrator of the abuse was not identified, but the Franklin County Children's Services approved Paternal Great Aunt to supervise visitation between the infant and her parents. In 2016, Paternal Great Aunt lost custody of her child for nine months due to the child's domestic violence and drug abuse. Paternal Great Aunt stated she stopped using marijuana in 2020. Paternal Great Aunt failed to file the Statement of Understanding related to her pursuit of legal custody. Mother objected to Paternal Great Aunt's motion for legal custody due to the unknown cause of the infant's injuries. LCDJFS found Paternal Great Aunt to be an inappropriate placement.

{¶36} LCDJFS explored other kinship placements but found them to be inappropriate. The paternal great grandmother of D.K. resided in Louisiana and was considered to be a viable placement for D.K. and G.H., but there were concerns that when Mother lived with the paternal great grandmother and the father of D.K., they engaged in

drug use. The process for Interstate Compact on the Placement of Children was initiated but not completed at the time of the hearings.

### Best Interests

{¶37} LCDJFS testified it was in the best interests of the G.H., D.K., and D.H. to be placed in the permanent custody of LCDJFS. The GAL recommended the termination of parental rights.

{¶38} D.K. and G.H. both expressed a desire to remain together. They wanted to live with their current foster family or be placed in the custody of paternal great grandmother. Neither expressed a desire to reside with Mother.

### Magistrate's Decision, Objections, and Final Judgment

{¶39} The 32-page Magistrate's Decision was filed on September 16, 2021, granting permanent custody of G.H., D.K., and D.H. to LCDJFS. The Magistrate denied the motions for legal custody of Mother and Paternal Great Aunt. The motion for a PPLA for G.H. was also denied. The trial court approved and adopted the Magistrate's Decision on September 16, 2021.

{¶40} Mother and Father filed objections to the Magistrate's Decision. By judgment entry filed on April 6, 2022, the juvenile court overruled Mother and Father's objections in a thoroughly written decision. The juvenile court modified the Magistrate's Decision in part, first finding that Mother had abandoned D.H. and the parental rights of Mother and Father of D.H. should be terminated based upon their abandonment of the child. Second, the juvenile court modified the Magistrate's Decision to order that all visitations and contact between Mother and Father with the children should be terminated immediately.

{¶41} It is from this judgment that Father now appeals.

**ASSIGNMENT OF ERROR**

{¶42} Father raises one Assignment of Error:

{¶43} "I. THE JUDGMENT OF THE TRIAL COURT THAT THE BEST INTERESTS OF THE MINOR CHILD WOULD BE SERVED BY THE GRANTING OF PERMANENT CUSTODY TO THE AGENCY WAS NOT [SIC] AGAINST THE MANIFEST WEIGHT AND SUFFICIENCY OF THE EVIDENCE."

**ANALYSIS**

{¶44} In his appeal of the juvenile court judgment granting permanent custody of D.H. to LCDJFS, Father raises one general Assignment of Error with multiple specific underlying issues. We address each specific issue in turn.

**Standard of Review**

{¶45} "[T]he right to raise a child is an 'essential' and 'basic' civil right." *In re Murray*, 52 Ohio St.3d 155, 157, 556 N.E.2d 1169 (1990), quoting *Stanley v. Illinois*, 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972). An award of permanent custody must be based on clear and convincing evidence. R.C. 2151.414(B)(1). Clear and convincing evidence is that evidence "which will provide in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established." *Cross v. Ledford*, 161 Ohio St. 469, 120 N.E.2d 118 (1954). "Where the degree of proof required to sustain an issue must be clear and convincing, a reviewing court will examine the record to determine whether the trier of facts had sufficient evidence before it to satisfy the requisite degree of proof." *Id.* at 477, 120 N.E.2d 118. If some competent, credible evidence going to all the essential elements of the case supports the trial court's judgment, an appellate court

must affirm the judgment and not substitute its judgment for that of the trial court. *C.E. Morris Co. v. Foley Constr. Co.*, 54 Ohio St.2d 279, 376 N.E.2d 578 (1978).

{¶46} Issues relating to the credibility of witnesses and the weight to be given to the evidence are primarily for the trier of fact. *Seasons Coal v. Cleveland*, 10 Ohio St.3d 77, 80, 461 N.E.2d 1273 (1984). Deferring to the trial court on matters of credibility is "crucial in a child custody case, where there may be much evidence in the parties' demeanor and attitude that does not translate to the record well." *Davis v. Flickinger*, 77 Ohio St.3d 415, 419, 674 N.E.2d 1159 (1997).

{¶47} R.C. 2151.414 sets forth the guidelines a trial court must follow when deciding a motion for permanent custody. R.C. 2151.414(A)(1) mandates the trial court schedule a hearing and provide notice upon the filing of a motion for permanent custody of a child by a public children services agency.

{¶48} Pursuant to R.C. 2151.414(B)(1), the trial court may grant permanent custody of a child to a movant if the court determines at the hearing, by clear and convincing evidence, that it is in the best interest of the child to grant permanent custody of the child to the agency that filed the motion for permanent custody and that any of the following apply:

> (a) The child is not abandoned or orphaned, has not been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, or has not been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period if, as

described in division (D)(1) of section 2151.413 of the Revised Code, the child was previously in the temporary custody of an equivalent agency in another state, and the child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents.

(b) The child is abandoned.

(c) The child is orphaned, and there are no relatives of the child who are able to take permanent custody.

(d) The child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, or the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period and, as described in division (D)(1) of section 2151.413 of the Revised Code, the child was previously in the temporary custody of an equivalent agency in another state.

(e) The child or another child in the custody of the parent or parents from whose custody the child has been removed has been adjudicated an abused, neglected, or dependent child on three separate occasions by any court in this state or another state. * * * *.

{¶49} If the child is not abandoned or orphaned, the focus turns to whether the child cannot be placed with either parent within a reasonable period of time or should not be placed with the parents. Under R.C. 2151.414(E), the trial court must consider all

relevant evidence before making this determination. The trial court is required to enter such a finding if it determines, by clear and convincing evidence, that one or more of the factors enumerated in R.C. 2151.414(E)(1) through (16) exist with respect to each of the child's parents.

{¶50} R.C. 2151.414(B) establishes a two-pronged analysis the trial court must apply when ruling on a motion for permanent custody. In practice, a trial court will usually determine whether one of the four circumstances delineated in R.C. 2151.414(B)(1)(a) through (e) is present before proceeding to a determination regarding the best interest of the child. Pursuant to R.C. 2151.414(D)(1), in determining the best interest of a child in a permanent custody proceeding, the court shall consider all relevant factors.

### A Hearing Within 120 Days under R.C. 2151.414(A)(2)

{¶51} Father argues in his first issue that the juvenile court erred when it awarded permanent custody of D.H. to LCDJFS because the juvenile court did not hold the hearing on LCDJFS's motion for permanent custody within 120 days after the motion was filed. In his appellate brief, Father repeatedly cites to R.C. 2151.141 in support of his argument. R.C. 2151.141 governs the "Requests for Copies of Records" in a dependency proceeding. The correct citation is R.C. 2151.414, "Procedures Upon Motion." R.C. 2151.414 states in pertinent part:

> (A)(1) Upon the filing of a motion pursuant to section 2151.413 of the Revised Code for permanent custody of a child, the court shall schedule a hearing and give notice of the filing of the motion and of the hearing, in accordance with section 2151.29 of the Revised Code, to all parties to the action and to the child's guardian ad litem. * * *

The court shall conduct a hearing in accordance with section 2151.35 of the Revised Code to determine if it is in the best interest of the child to permanently terminate parental rights and grant permanent custody to the agency that filed the motion. The adjudication that the child is an abused, neglected, or dependent child and any dispositional order that has been issued in the case under section 2151.353 of the Revised Code pursuant to the adjudication shall not be readjudicated at the hearing and shall not be affected by a denial of the motion for permanent custody.

(2) The court shall hold the hearing scheduled pursuant to division (A)(1) of this section not later than one hundred twenty days after the agency files the motion for permanent custody, except that, for good cause shown, the court may continue the hearing for a reasonable period of time beyond the one-hundred-twenty-day deadline. The court shall issue an order that grants, denies, or otherwise disposes of the motion for permanent custody, and journalize the order, not later than two hundred days after the agency files the motion.

* * *

The failure of the court to comply with the time periods set forth in division (A)(2) of this section does not affect the authority of the court to issue any order under this chapter and does not provide any basis for attacking the jurisdiction of the court or the validity of any order of the court.

{¶52} LCDJFS filed the motion for permanent custody relating to D.H. on October 9, 2020. In our Statement of Facts above, we reviewed the numerous motions pending

before the juvenile court in relation to D.H., G.H., and D.K. On January 29, 2021, when the hearings on all the pending motions commenced, 113 days had passed from the filing of the October 9, 2020 motion for permanent custody. Father contends the juvenile court did not take evidence on the motion for permanent custody of D.H. until the March 18, 2021 hearing after which, 160 days had passed.

{¶53} At the start of the January 29, 2021 hearing, the juvenile court notified the parties that it was going to begin with Paternal Great Aunt's motion requesting legal custody of D.H. (T. 5). A review of the hearing transcript shows that Father's counsel did not object to the juvenile court starting with Paternal Great Aunt's motion for legal custody, as opposed to the motion for permanent custody of D.H.

{¶54} We find no error based on the language of R.C. 2151.414(A)(2) and the purpose of Chapter 2151. The central purpose of the juvenile court system is "[t]o provide for the care, protection, and mental and physical development of children." *In re L.W.,* 5th Dist. No. 2020 CA 0026, 2020-Ohio-5439, 163 N.E.3d 643, 2020 WL 6948173, ¶ 37 quoting *In re Z.R.*, 144 Ohio St.3d 380, 2015-Ohio-3306, 44 N.E.3d 239, ¶ 20 citing R.C. 2151.01(A). The General Assembly has made clear that the laws governing the administration of the juvenile courts must be "liberally interpreted and construed" to effectuate the above purposes. *Id.*; R.C. 2151.01. The Ohio Supreme Court stated:

> In application, the goals of protecting and caring for children, in conjunction with the requirement of statutory flexibility in promoting those goals, result in proceedings that are less formal and less adversarial than in courts of general jurisdiction. *See In re T.R.* at 15, 556 N.E.2d 439. Not surprisingly then, juvenile courts must prioritize substance over form.

*In re Z.R., supra* at ¶ 21. In that regard, we refer to the language of R.C. 2151.414(A)(2):

> The failure of the court to comply with the time periods set forth in division (A)(2) of this section does not affect the authority of the court to issue any order under this chapter and does not provide any basis for attacking the jurisdiction of the court or the validity of any order of the court.

R.C. 2151.414(A)(2).

{¶55} While the juvenile court first took evidence on the motion for legal custody of D.H., we find the evidence taken over the five-day hearing was cumulative, all relevant to the determination of whether it was in the best interests of the children to be placed in the permanent custody of LCDJFS. Further, under R.C. 2151.414(A)(2), we find the juvenile court's alleged failure to hold a hearing on D.H.'s permanent custody motion within 120 days does not provide any basis for attacking the validity of the juvenile court's April 6, 2022 judgment. *See In re K.M.*, 159 Ohio St.3d 544, 2020-Ohio-995, 152 N.E.3d 245, ¶ 25.

**Temporary Custody Not Beyond Two Years**

{¶56} Father contends in his second issue that the juvenile court was in violation of R.C. 2151.415(D)(4). The statute reads:

> (4) No court shall grant an agency more than two extensions of temporary custody pursuant to division (D) of this section and the court shall not order an existing temporary custody order to continue beyond two years after the date on which the complaint was filed or the child was first placed into shelter care, whichever date is earlier, regardless of whether any

extensions have been previously ordered pursuant to division (D) of this section.

R.C. 2151.353(G) contains an identical two-year time limitation on trial court orders extending temporary custody. *In re H.S.,* 9th Dist. Summit No. 30154, 2022-Ohio-1478, ¶ 9.

{¶57} The Emergency Ex Parte Order of removal for D.H. was granted on December 11, 2018. The final day of the custody hearings was May 12, 2021, which was two years, five months, and one day after D.H. was first placed in shelter care. Father contends that because D.H. was in the temporary custody of LCDJFS beyond the time limit allowed by R.C. 2151.415(D)(4), the juvenile court was required to dismiss the D.H.'s case.

{¶58} In its judgment entry overruling Father's objections to the Magistrate's Decision, in which Father did not raise any objection under R.C. 2151.415(D)(4), the trial court addressed the issue:

> Furthermore, clear and convincing evidence was presented that no additional time exists for [Mother], * * * and [Father] to remedy the conditions that led to the removal of the children. This Court cannot order an existing temporary custody order to continue beyond two (2) years after the date on which the complaint was filed or the children were first placed into shelter care, whichever date is earlier. R.C. 2151.353(G) and R.C. 2151.415(D)(4). As of May 12, 2021, the final date the pending motions were heard by the Magistrate, and [sic] excess of two (2) years had lapsed since the children were placed in shelter care custody. (Tr. 189, 610, 618). No period of

extension remains in the above-captioned matters. R.C. 2151.353(G) and

R.C. 2151.415(D)(4).

(Judgment Entry, April 6, 2022). The juvenile court recognized it was without statutory authority to grant any further extensions of temporary custody by the time of the permanent custody hearing. But, as we will discuss below, there was no justification for any extension in temporary custody because the evidence demonstrated that D.H. could not and should not be placed with Father within a reasonable period of time. *See In re U.G.*, 9th Dist. Summit No. 30193, 2022-Ohio-3905, ¶ 12.

### Twelve Out of Twenty-Two Months

{¶59} The juvenile court determined that pursuant to R.C. 2151.414(B)(1)(d), G.H., D.K., and D.H. were in the temporary custody of LCDJFS for twelve months of a consecutive twenty-two-month period. Father does not dispute this fact. This Court has adopted the position that proof of temporary custody with an agency for twelve or more months of a consecutive twenty-two-month period alone is sufficient to award permanent custody. *Matter of O.M.*, 5th Dist. Coshocton No. 20CA0017, 2021-Ohio-1310, 2021 WL 1424200, ¶ 33 citing *In the Matter of A.S., V.S., and Z.S.*, 5th Dist. Delaware No. 13 CAF 050040, 2013-Ohio-4018. Therefore, a finding that grounds existed for permanent custody cannot be against the manifest weight of the evidence. *Matter of L.G.*, 5th Dist. Stark No. 2020-CA-00139, 2021-Ohio-743, ¶ 36.

### Best Interest Factors

{¶60} Father contends in another issue that the juvenile court erred when it found it was in the best interest of D.H. to be placed in the permanent custody of LCDJFS. We disagree.

{¶61} As an appellate court, we neither weigh the evidence nor judge the credibility of the witnesses. Our role is to determine whether there is relevant, competent, and credible evidence upon which the fact finder could base its judgment. *Cross Truck v. Jeffries*, 5th Dist. Stark No. CA5758 (Feb. 10, 1982). Accordingly, judgments supported by some competent, credible evidence going to all the essential elements of the case will not be reversed as being against the manifest weight of the evidence. *C.E. Morris Co. v. Foley Constr.*, 54 Ohio St.2d 279, 376 N.E.2d 578 (1978).

{¶62} In determining the best interest of the child at a permanent custody hearing, R.C. 2151.414(D)(1) mandates the trial court must consider all relevant factors, including, but not limited to, the following: (a) the interaction and interrelationship of the child with the child's parents, siblings, relatives, foster parents and out-of-home providers, and any other person who may significantly affect the child; (b) the wishes of the child as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child; (c) the custodial history of the child; (d) the child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody; and (e) whether any of the factors in division (E)(7) to (11) of R.C. 2151.414 apply in relation to the parents and child.

{¶63} A child's best interests are served by the child being placed in a permanent situation that fosters growth, stability, and security. We have frequently noted, "[t]he discretion which the juvenile court enjoys in determining whether an order of permanent custody is in the best interest of a child should be accorded the utmost respect, given the nature of the proceeding and the impact the court's determination will have on the lives of the parties concerned." *In re E.H.*, 5th Dist. Stark No. 2022CA00007, 2022-Ohio-1682,

2022 WL 1579856, ¶ 101 quoting *In re Mauzy Children*, 5th Dist. No. 2000CA00244, 2000 WL 1700073 (Nov. 13, 2000), citing *In re Awkal*, 85 Ohio App.3d 309, 316, 642 N.E.2d 424 (8th Dist. 1994). In this case, we find there was competent, credible evidence to support the juvenile court's decision that it was in the best interest of D.H. to be placed in the permanent custody of LCDJFS.

{¶64} The juvenile court found that "[D.H.], tragically has no significant relationship with any person." (Judgment Entry, April 6, 2022). D.H. was removed from Mother's care after his birth. D.H.'s last visitation with Mother was in July 2020 and his last contact with her was on March 2, 2020. The juvenile court calculated Father's contact with D.H. amounted to two hours. D.H. had been placed in multiple foster homes, through no fault of his own, and was most recently placed in a foster to adopt home.

{¶65} Father argues the juvenile court should have considered Paternal Great Aunt as legal custodian for D.H. because it was in the child's best interest to be placed with a biological family member.[1] The willingness of a relative to care for the child does not alter what a court considers in determining permanent custody. *In re Patterson*, 134 Ohio App.3d 119, 129, 730 N.E.2d 439, 446–47, 1999 WL 691817 (9th Dist.1999) citing *In re Mastin*, Lorain App. Nos. 97CA006743 and 97CA006746, 1997 WL 795809 (Dec. 17, 1997), * 7. The clear and convincing evidence demonstrated that Paternal Great Aunt was not a suitable placement for D.H. based on her prior history with Children's Services. While Franklin County Children's Services approved Paternal Great Aunt to supervise visitation, LCDJFS conducted its own investigation and determined she was not a suitable

---

[1] The juvenile court considered Paternal Great Aunt's motion for legal custody and denied the motion because it was not in the best interest of D.H. Father has not raised the denial of the motion for legal custody as a separate assignment of error.

placement for D.H. The juvenile court, as factfinder, weighed the credibility of the LCDJFS testimony as to its investigation into Paternal Great Aunt's suitability for placement. The juvenile court found it was in the best interests of D.H. to be placed in the permanent custody of LCDJFS, rather than Paternal Great Aunt. The record in this case supports the juvenile court's determination. D.H. deserves a legally secure placement which can be better achieved by the grant of permanent custody to LCDJFS.

### Reasonable Case Planning & Diligent Efforts

{¶66} In another issue, Father contends the juvenile court erred as to its determination under R.C. 2151.414(E)(1). The statute reads:

Following the placement of the child outside the child's home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child to be placed outside the home, the parent has failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home. In determining whether the parents have substantially remedied those conditions, the court shall consider parental utilization of medical, psychiatric, psychological, and other social and rehabilitative services and material resources that were made available to the parents for the purpose of changing parental conduct to allow them to resume and maintain parental duties.

{¶67} The court must examine the reasonable case planning and diligent efforts by the agency to assist the parents when considering whether the child cannot and should not be placed with the parent within a reasonable time. *In re L.J.R.*, 5th Dist. Richland No.

2022 CA 0030, 2022-Ohio-3418, 2022 WL 4492196, ¶ 49 citing *In re C.F.*, 113 Ohio St.3d 73, 2007-Ohio-1104, 852 N.E.2d 816. The issue is not whether there was anything more the agency could have done, but whether the agency's case planning and efforts were reasonable and diligent under the circumstances of the case. *In re J.D.*, 3rd Dist. Hancock Nos. 5-10-34, 2011-Ohio-1458. The child's health and safety is paramount in determining whether reasonable efforts were made. *In re R.P.*, 5th Dist. Tuscarawas No. 2011-Ohio-5378.

{¶68} In his appellate brief, Father argues LCDJFS should have made more diligent efforts to help him complete his case plan. He completed a substance abuse program while in prison and sought substance abuse treatment after he relapsed while out of prison. He argues that in between his criminal trials and incarcerations, LCDJFS should have referred Father to a different domestic violence prevention program because he was unable to participate in the one assigned to him due to a pending criminal matter.

{¶69} The record in this case shows LCDJFS made reasonable efforts to assist Father with reunification. The juvenile court considered the efforts of the agency and found that despite its efforts, Father continuously and repeatedly failed to substantially remedy the conditions that caused D.H. to be placed outside of his home. Father did not complete mental health treatment, obtain appropriate housing, or a stable income. He had a no contact order with Mother, which he disregarded and creatively evaded. On the final day of the custody hearing, both Mother and Father were incarcerated. We agree the clear and convincing evidence supported the juvenile court's conclusion that D.H. could not be placed with Father and there was no reasonable cause to believe that reunification with Father could occur.

**Abandonment**

{¶70} In his final issue, Father contends the juvenile court's determination that Father abandoned D.H. was in error. We note that Father does not refer this Court to the statute under which he contends the juvenile court erred in its determination.

{¶71} The juvenile court cited to R.C. 2151.414(E)(10) in its decision to affirm the Magistrate's Decision that Father abandoned D.H. R.C. 2151.414(E)(1) states in pertinent part, "*If the court determines, by clear and convincing evidence, * * * that one or more of the following exist as to each of the child's parents, * * * the court shall enter a finding that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent: * * * [t]he parent has abandoned the child." The juvenile court further cited R.C. 2151.414(B)(1)(b) to find that Father had abandoned D.H. and modified the Magistrate's Decision to reflect its independent determination. The statute reads:

(B)(1) Except as provided in division (B)(2) of this section, the court may grant permanent custody of a child to a movant if the court determines at the hearing held pursuant to division (A) of this section, by clear and convincing evidence, that it is in the best interest of the child to grant permanent custody of the child to the agency that filed the motion for permanent custody and that any of the following apply:

* * *

(b) The child is abandoned.

{¶72} "[A] child shall be presumed abandoned when the parents of the child have failed to visit or maintain contact with the child for more than ninety days, regardless of

whether the parents resume contact with the child after that period of ninety days." R.C. 2151.011(C).

{¶73} The evidence in the record shows that Father did not visit or have contact with D.H. from May 11, 2019 through November 20, 2020, a period in excess of 90 days. (T. 172, 412-414). Father visited D.H. on November 20, 2020 and was then incarcerated on November 23, 2020. He was incarcerated for the remainder of the case. The juvenile court stated:

> [Father] attended one visitation session with [D.H.] in November of 2020; however, this visit does not negate his prior abandonment of the child. * * * [Father] then again abandoned the child from November 24, 2020 through May 12, 2021, the final hearing date on the State's Motion for Permanent Custody, also a period in excess of ninety (90) days. * * * The Fifth District Court of Appeals has held that lack of contact for ninety (90) days during a period of incarceration supports a presumption of abandonment. *In re W.H.*, 5th Dist. Stark No. 2015CA00131, 2015-Ohio-4360 citing *In re Wright*, 5th Dist. Stark No. 2003CA00347, 2004-Ohio-1094.

(Judgment Entry, Apr. 6, 2022).

{¶74} In his appellate brief, Father argues his participation in his case plan objectives negated his failure to have contact with D.H. He does not cite this Court to any case law to support his position. The record in this case demonstrates the juvenile court's determination that Father abandoned D.H. was supported by the clear and convincing evidence.

**CONCLUSION**

{¶75} Upon this record, we find the juvenile court's decision that permanent custody of D.H. to LCDJFS was in the best interest of the child based upon competent, credible evidence and is not against the manifest weight of the evidence.

{¶76} Father's Assignment of Error is overruled.

{¶77} The judgment of the Licking County Court of Common Pleas is affirmed.

By: Delaney, J.,

Wise, Earle, P.J. and

Wise, John, J., concur.