**[Cite as *In re C.K.*, 2024-Ohio-1427.]**

COURT OF APPEALS
KNOX COUNTY, OHIO
FIFTH APPELLATE DISTRICT

|                        |     |                                   |
|------------------------|-----|-----------------------------------|
|                        | :   | JUDGES:                           |
|                        | :   |                                   |
|                        | :   | Hon. Patricia A. Delaney, P.J.    |
|                        | :   | Hon. John W. Wise, J.             |
| IN RE C.K.             | :   | Hon. Andrew J. King, J.           |
|                        | :   |                                   |
|                        | :   | Case No. 23CA000013               |
|                        | :   |                                   |
|                        | :   |                                   |
|                        | :   |                                   |
|                        | :   |                                   |
|                        | :   |                                   |
|                        | :   | O P I N I O N                     |


CHARACTER OF PROCEEDING:          Appeal from the Knox County Court of
                                  Common Pleas, Juvenile Division, Case
                                  No. 221 2026


JUDGMENT:                         AFFIRMED


DATE OF JUDGMENT ENTRY:           April 15, 2024


APPEARANCES:


For Mother-Appellant:                       For KCDJFS-Appellee:

RICHARD D. HIXSON                           PORTER R. WELCH
3808 James Court, Suite 2                   117 East High St.
Zanesville, OH 43701                        Mount Vernon, OH 43050

*Delaney, P.J.*

{¶1} Mother-Appellant S.R. appeals the September 26, 2023 judgment entry of the Knox County Court of Common Pleas, Juvenile Division awarding permanent custody of her child, C.K., to the Knox County Department of Job and Family Services-Appellee.

### FACTS AND PROCEDURAL HISTORY

{¶1} Mother-Appellant S.R. is the biological mother of C.K., born in August 2014. Father T.K. is the biological father of C.K. Mother and Father are not married. Father has not been involved in this case and the focus of this appeal is on Mother and child. C.K. has been diagnosed with autism, ADHD, anxiety, obsessive behaviors, emotional dysregulation disorder, and sleep seizure disorder.

### KCDJFS Complaint

{¶2} On April 1, 2021, Knox County Department of Job and Family Services-Appellee ("KCDJFS") filed a complaint alleging abuse, neglect, and/or dependency based on Mother's methamphetamine use. KCDJFS had been working with Mother since February 2021 after Mother was found in possession of methamphetamine while operating a motor vehicle with C.K. in the backseat. Mother was charged with possession of drugs. KCDJFS asked Mother for a drug screen, which she took in March 2021 and tested positive for methamphetamine, amphetamine, and THC. The trial court appointed a Guardian ad Litem to represent C.K.

{¶3} An adjudicatory hearing was held on May 5, 2021, where Mother was ordered to submit to an instant drug screen. Mother tested negative. Via judgment entry issued May 20, 2021, the trial court found C.K. to be a dependent child pursuant to R.C. 2151.04(C).

{¶4} Mother submitted to a random drug screen on May 6, 2021, where she tested positive for methamphetamine, amphetamine, and THC. KCDJFS believed Mother or Maternal Grandmother was going to abscond with the child and therefore on May 11, 2021, moved the trial court for an ex parte emergency shelter care order. On May 11, 2021, the trial court granted the order and placed C.K. in temporary custody of KCDJFS. The Shelter Care hearing was held on May 28, 2021, where the trial court ordered that C.K. remain in the temporary custody of KCDJFS.

{¶5} The dispositional hearing was held on June 2, 2021 and the judgment entry filed on June 15, 2021. The child had been placed in kinship care. Mother was seeking substance abuse treatment with Freedom Center and was going to seek mental health management. The trial court continued temporary custody with KCDJFS. A review hearing was held on September 1, 2021, where the trial court continued temporary custody with KCDJFS.

{¶6} KCDJFS removed C.K. from kinship care in July 2021 and placed him with a foster family. Mother tested positive for methamphetamine on the day she brought C.K. to the agency.

{¶7} A review hearing was held on October 18, 2021. Mother last tested positive for methamphetamine on September 20, 2021, but she was beginning to engage in her case plan activities at the Freedom Center for parenting classes, substance abuse treatment, and mental health treatment. A review hearing was held on January 19, 2022, where Mother had requested a return of C.K. to her custody but the trial court continued temporary custody with KCDJFS. At the review hearing on March 23, 2022, KCDJFS requested its first extension, which the trial court granted.

{¶8} On October 5, 2022, the trial court ordered that C.K. be returned to Mother's custody under protective supervision by KCDJFS. KCDJFS stated that Mother was in compliance with her case plan and had remedied the conditions that required the removal of C.K. from her home.

{¶9} On January 10, 2023, KCDJFS filed a motion to modify disposition/motion for temporary custody. In the motion, KCDJFS stated that Mother had relapsed on methamphetamine, which Mother denied. On December 13, 2022, December 30, 2022, and January 4, 2023, Mother screened positive for methamphetamine. On December 21, 2022, Mother screened positive for buprenorphine. A hearing was held on January 30, 2023. KCDJFS requested that the child be permitted to remain in Mother's residence because she had engaged in treatment, admitted to a relapse, and provided two negative drug screens. The trial court ordered KCDJFS's protective supervision to continue while it was permitted to visit C.K. at school and/or drug test him at school.

{¶10} On February 13, 2023, Mother tested positive for methamphetamine. KCDJFS also learned that Mother withdrew C.K. from his public school with the intent to homeschool him. On March 1, 2023, KCDJFS filed a motion with the trial court to modify the temporary orders that Mother was not permitted to homeschool C.K. The trial court issued an ex parte emergency shelter care order placing C.K. in the pre-dispositional temporary custody and shelter care of KCDJFS.

{¶11} On March 10, 2023, KCDJFS filed a motion for permanent custody and motion to extend temporary custody pending the hearing on the motion for permanent custody. The trial court granted the second motion for extension of temporary custody.

{¶12} The trial court appointed an attorney advocate for C.K.

{¶13} The GAL report filed on August 1, 2023 recommended that C.K. be placed in the permanent custody of KCDJFS. The trial court held the permanent custody hearing on August 8, 2023. The following facts were adduced at the hearing.

**A Child with Special Needs**

{¶14} Dr. Justin Wildemann, a pediatrician with Akron Children's Hospital, testified to C.K.'s diagnoses and treatment. C.K. had been his patient for one and a half years. C.K. was diagnosed with mild to moderate autism, moderate ADHD, sleep seizure disorder (possible epilepsy), emotional dysregulation disorder, mild to moderate anxiety, and mild to moderate obsessive behaviors. Dr. Wildemann treated C.K. for ADHD, autism, anxiety, and emotional dysregulation. C.K. was also being treated by specialists such as a neurologist for his sleep seizure disorder. C.K. was currently prescribed an antidepressant, an ADHD stimulant medication, and a sleep medication. Dr. Wildemann recommended that C.K. attend applied behavioral analysis (ABA) therapy, which C.K. was currently attending. Dr. Wildemann had met with Mother several times where he discussed C.K.'s diagnoses and Mother seemed willing to cooperate with Dr. Wildemann's recommended treatments. C.K. missed two appointments in November 2022 to January 2023.

{¶15} Dr. Wildemann testified that for children with diagnoses such as C.K.'s, those children benefited from consistent and stable environments. For C.K. and his moderate diagnosis of ADHD, Dr. Wildemann recommended that he be in a school environment that had support systems in place, such as an IEP. Dr. Wildemann testified that an IEP and a school psychologist could figure out the best method for C.K. to learn and reinforce those methods, allowing C.K. to succeed.

{¶16} Michaele Hermes, a board-certified behavior analyst with the Mid-Ohio Educational Service Center and Advanced Behavioral Services, testified that she had been providing C.K. with ABA therapy since May 2022 until Fall 2022, and then again in April 2023 to the date of the hearing. Hermes met with C.K. for about three to four hours a week to build communication skills, daily living skills, communication skills, and coping skills. When Hermes started working with C.K. in April/May 2022, they worked to get C.K. ready for school and to transition back to Mother's care. C.K. was independent in 90% of his skills. He managed self-care such as showering, picking out his clothes, and brushing teeth. He mastered letter sounds and letter blends to assist in his independent reading. Custody was returned to Mother and the therapy terminated by the organization due to the change in custody. Mother could have sought out and applied for ABA services but did not. C.K. started services again in April 2023 (when he returned to foster care) and Hermes testified she observed that C.K. had regressed in all of his skills. He appeared to have lost confidence in himself and the self-motivation to independently care for himself.

{¶17} School employees testified about C.K.'s experiences in public school. In the 2022-2023 school year, C.K. had nineteen unexcused absences from school from October 5, 2022 to February 2023. The school sent Mother multiple letters notifying her of C.K.'s excessive school absences. The school was in the process of setting up a diversion meeting due to C.K.'s excessive unexcused absences when Mother withdrew C.K. from public school with the stated intent of home schooling him. The school was never notified of any bullying issues against C.K., which Mother gave as one of the reasons for his withdrawal. The school considered C.K. a high risk, special needs student due to his diagnoses and low IQ. While at school, he was supported by an IEP, a shared

adult aide, and additional services such as occupational therapy, speech therapy, and physical therapy. The school counselor opined that home schooling may not be the best alternative for C.K. because all those services would need to be provided continuously.

{¶18} Foster Mother testified that C.K. was placed with her family from May 2021 to September 2022 and from March 2023 to the date of the hearing. Foster Mother has had no contact with C.K.'s father. When C.K. was with his foster family the first time, he was consistent with ABA therapy where he improved his ability to self-care. He could shower independently, his speech had improved, and he could get his hair cut without trouble. He had stopped picking at his skin. When C.K. was returned to their care, Foster Mother testified that C.K. had regressed. He was obsessively picking at his skin again. He was refusing to attend school and making himself vomit to go home. He had issues with personal care. Foster Mother re-enrolled C.K. in school and services. During the summer of 2023, C.K. received daily therapy, including ABA therapy, occupational therapy, physical therapy, and speech therapy.

{¶19} When C.K. was returned to her care, Foster Mother testified that C.K. had gained twenty to thirty pounds to a point that he was complaining of leg pain. He was evaluated in physical therapy to determine the cause of the leg pain. In order to manage his weight, Foster Mother encouraged C.K. to play outside and he had been losing weight. Foster Mother was also concerned that while in Mother's care, C.K. was not properly taking his prescribed medications. He came to Foster Parents with an unopened inhaler and daily medications that still had thirty pills in the bottle at the end of the month.

{¶20} Foster Mother testified that C.K. was bonded with his foster parents. There were six children in the family. Foster Mother observed that C.K. and Mother were bonded

and loved each other. C.K. was excited for visitation with Mother. Foster Mother facilitated communication with C.K. and Mother with regular FaceTime calls. It was sometimes difficult to understand what C.K. was saying and occasionally Mother got upset when Foster Mother intervened to interpret or C.K. was upset at being misunderstood. Foster Mother described C.K. as a happy, smart, and bright child. He enjoyed being outside. His favorite food was apples.

### Mother's Progress

{¶21} The caseworker with KCDJFS spoke of their involvement with Mother and C.K. KCDJFS got involved with Mother and C.K. after she was stopped and found in possession of methamphetamine while C.K. was in her car. KCDJFS filed an ex parte motion in May 2021 after Mother tested positive for methamphetamine multiple times. The trial court granted temporary custody of C.K. to KCDJFS but the agency could not locate Mother or C.K. Mother agreed to bring C.K. to the agency on the promise the child would be placed with a specific kinship provider. The kinship provider failed, and the child was placed with his foster family in July 2021. On July 28, 2021, the day Mother drove C.K. to the agency, she tested positive for methamphetamines.

{¶22} Mother was assigned a case plan which included services for substance abuse, mental health, and parenting. The plan also required Mother to sign requested releases. Mother actively engaged in her case plan services. She attended appointments for substance abuse and mental health at Freedom Center and BHP, completed a parenting class, obtained appropriate medical care for C.K., started communicating with medical providers, and cooperating with KCDJFS. Mother has had consistent housing throughout the case. Mother stopped testing positive for illicit drugs. Mother progressed

to unsupervised, overnight visitation with C.K. Based on her progress, C.K. was returned to Mother's custody in September 2022.

{¶23} Mother obtained a medical marijuana card after she started testing positive for THC. In December 2022, Mother started testing positive for methamphetamine and Suboxone. KCDJFS worked to keep C.K. in the home by supporting her sobriety. KCDJFS was aware that C.K. was missing school. It then learned that Mother had unenrolled C.K. from school to homeschool him but had not yet put the recommended therapies in place. Mother finally admitted that she had relapsed. C.K. was returned to the foster family's care. When he was returned to their care, the caseworker noticed that C.K. had gained weight and had trouble walking up the stairs due to leg pain. In April 2023, KCDJFS restricted Mother's in-person access to C.K.'s medical appointments due to her negative behavior. She was permitted to attend the appointments virtually.

{¶24} KCDJFS looked into possible kinship care for C.K. Maternal Grandmother was ruled out because she was involved in restricting the agency's access to C.K. Neither C.K.'s father nor his family was interested in placement. Father had declined visitation with C.K.

{¶25} KCDJFS's concern for Mother was her historical use of drugs showing an inconsistent level of sobriety. It was also concerned about Mother's consistent follow-through with C.K.'s providers and support for C.K., which included reinforcing the self-care skills he was learning even if he did not want to do them. Mother was inconsistent with making sure C.K. completed his homework and became resistant when asked about it.

{¶26} Mother was under probation through the Knox County Adult Probation until approximately June or July of 2024, subject to a recommendation for early termination, due to convictions for assault and OVI. Her probation officer testified that Mother tested positive for THC, but she had a medical marijuana card. Mother did not inform her probation officer that she tested positive for methamphetamine on KCDJFS screens in December 2022, January 2023, and February 2023. The probation officer testified that Mother completed treatment, reported as required, finished requested classes, tested clean for illegal substances, finished a JOBS program, and had been paying towards her fines and costs.

{¶27} A report of Mother's drug screens was admitted as an exhibit. Mother tested positive for methamphetamines on December 13, 2022, December 30, 2022, January 1, 2023, January 11, 2023, February 13, 2023, February 14, 2023, and May 12, 2023. Mother also tested positive for buprenorphine (suboxone) on December 21, 2022 and May 30, 2023. While Mother was prescribed Adderall to address her ADHD, it would not register as methamphetamine. Mother denied some of the positive screens, stating the lab mixed up the results.

{¶28} Mother's psychiatrist testified that he had been treating Mother since 2018. She was being treated for bipolar disorder (mixed kind), generalized anxiety disorder, and ADHD combined type. Since 2018, he had prescribed Mother Adderall to treat her ADHD. In June 2023, the doctor changed her ADHD medication from Adderall to Vyvanse because it was less likely to be abused and there was an Adderall shortage. Mother's ADHD symptoms improved when she was taking her medication. Mother had notified her psychiatrist that she had a prior history of abusing cocaine, acid, PCP, mushrooms,

marijuana, Tramadol, and alcohol. She had never disclosed her methamphetamine or Suboxone use to her psychiatrist.

{¶29} Mother testified on her behalf. Mother had consistent rental housing for nine years. Mother had been employed but was seeking disability. She also had upcoming surgery, which would prevent her from working. Mother obtained her valid driver's license the day before the hearing. After working with the Freedom Center for almost two years to address her sobriety, Mother was now focusing on her mental health needs. At the time of the hearing, Mother was engaged to a man with two autistic children. She would be moving in September or October.

{¶30} Mother was asked why she did not pursue ABA therapy for C.K. while he was in her care. Mother contradicted the testimony of Foster Mother and the caseworker who testified they provided Mother with information for ABA therapy. She said that she asked for the information from KCDJFS, but the caseworker never responded. Mother testified that she pursued homeschooling because C.K. was complaining about being bullied at school. She had enrolled him in virtual speech therapy and was in the process of enrolling him in physical and occupational therapy but did not have those services set up before she took C.K. out of school. She believed that she could provide him with more support because she was his mother; however, Mother testified that if C.K. was returned to her care, she was going to keep him enrolled at the public school in the district where the foster family resided.

{¶31} As to C.K.'s medication, Mother testified that C.K. did not require the use of his allergy medicine or inhaler while in her care. She gave C.K. his antidepressant and sleeping medications as prescribed.

**Judgment Entry**

{¶32} The trial court issued its judgment entry on September 26, 2023. The trial court granted permanent custody of C.K. to KCDJFS. It first found that C.K. had been in the temporary custody of KCDJFS for more than twelve months out of a consecutive twenty-two-month period. It next found that C.K. could not be placed with either parent within a reasonable amount of time and it was in the best interests of C.K. to be placed with KCDJFS.

{¶33} It is from this judgment that Mother now appeals.

## ASSIGNMENT OF ERROR

{¶34} Mother raises one Assignment of Error:

I. THE TRIAL COURT ERRED IN FINDING THAT IT WAS IN THE BEST INTERESTS OF C.K. TO BE PLACED IN THE PERMANENT CUSTODY OF KCDJFS, AS SUCH A FINDING WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE AND UNSUPPORTED BY SUFFICIENT EVIDENCE.

## ANALYSIS

{¶35} In Mother's sole Assignment of Error, she argues the trial court erred when it found it was in the best interests of the child to be placed in the permanent custody of KCDJFS. We disagree.

{¶36} In determining the best interest of the child at a permanent custody hearing, R.C. 2151.414(D)(1) mandates the trial court must consider all relevant factors, including, but not limited to, the following: (a) the interaction and interrelationship of the child with the child's parents, siblings, relatives, foster parents and out-of-home providers, and any

other person who may significantly affect the child; (b) the wishes of the child as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child; (c) the custodial history of the child; (d) the child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody; and (e) whether any of the factors in division (E)(7) to (11) of R.C. 2151.414 apply in relation to the parents and child.

{¶37} A child's best interests are served by the child being placed in a permanent situation that fosters growth, stability, and security. We have frequently noted, "[t]he discretion which the juvenile court enjoys in determining whether an order of permanent custody is in the best interest of a child should be accorded the utmost respect, given the nature of the proceeding and the impact the court's determination will have on the lives of the parties concerned." *In re E.H.*, 5th Dist. Stark No. 2022CA00007, 2022-Ohio-1682, 2022 WL 1579856, ¶ 101 quoting *In re Mauzy Children*, 5th Dist. No. 2000CA00244, 2000 WL 1700073 (Nov. 13, 2000), citing *In re Awkal*, 85 Ohio App.3d 309, 316, 642 N.E.2d 424 (8th Dist. 1994). In this case, we find there was competent, credible evidence to support the trial court's decision that it was in the best interest of the C.K. to be placed in the permanent custody of KCDJFS.

{¶38} One issue in this case is that Mother's tenuous sobriety has affected her custodial history of C.K. KCDJFS became involved with Mother and C.K. after the police stopped Mother's vehicle where she was found with C.K. and in possession of methamphetamine. Mother repeatedly tested positive for methamphetamine. Mother argues in her appeal that there is no evidence that she used substances while in the presence of C.K. Mother testified that C.K. was with Maternal Grandmother when she

used drugs. The evidence, however, shows that Mother had methamphetamine in her system when she was in the presence of C.K. On the day Mother returned C.K. to the custody of KCDJFS, she tested positive for methamphetamine. Mother worked her case plan and admirably achieved sobriety so that C.K. could be returned to her care. However, Mother admitted that she relapsed after C.K. had been returned to her care.

{¶39} Another issue is whether Mother can serve C.K.'s best interests to foster his growth, stability, and security. C.K. is neurodivergent with multiple diagnoses that require consistent support for him to thrive and become self-sufficient. The evidence showed that while C.K. was in foster care, he received consistent therapeutic support so that he mastered some ability to self-care, his obsessive-compulsive behaviors were reduced, and his speech improved. When C.K. was returned to Mother's care, C.K. notably regressed. C.K. gained twenty to thirty pounds, which caused him leg pain. C.K. had nineteen days of unexcused absences from school. Mother did not re-establish the ABA therapeutic services that C.K. was receiving in foster care, which supported his ability to self-care. Foster Mother testified that C.K. could no longer do the skills he had previously mastered, such as the ability to bathe himself. Mother claimed that if C.K. was returned to her care, she would keep him enrolled in public school. C.K. was enrolled in public school when he was in Mother's care, and he missed nineteen days of school. When the school started the process of diversion, Mother withdrew C.K. from school with the stated intent of providing him with a home school education.

{¶40} There is no question that Mother and C.K. are bonded. Foster Mother testified that she would attempt to maintain a connection between C.K. and his Mother.

{¶41} In this case, C.K. requires an environment that will foster consistency, stability, and security to promote his growth and self-sufficiency. We find no error for the trial court to find it was in the best interests of C.K. to be placed in the permanent custody of KCDJFS. Mother's sole Assignment of Error is overruled.

## CONCLUSION

{¶42} The judgment of the Knox County Court of Common Pleas, Juvenile Division, if affirmed.

By: Delaney, P.J.,

Wise, J. and

King, J., concur.